IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CINDY GONZALEZ, | § | |
| | § | No. 416, 2018 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | |
| THE STATE OF DELAWARE, | § | C.A. No. N18C-01-144-RRC |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: February 20, 2019
Decided: March 12, 2019

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **REVERSED**.

John S. Whitelaw, Esquire (*Argued*), Katherine E. Sell, Esquire, COMMUNITY LEGAL AID SOCIETY, INC., Wilmington and Dover, Delaware; Travis W. England, Esquire, NATIONAL CENTER FOR LAW AND ECONOMIC JUSTICE, New York, New York, for Appellant, Cindy Gonzalez.

Oliver J. Cleary, Esquire (*Argued*), Department of Justice, Wilmington, Delaware, for Appellee, the State of Delaware.

Joanna J. Cline, Esquire, PEPPER HAMILTON LLP, Wilmington, Delaware, for *Amicus Curiae* David. A. Super, Georgetown University Law Center, in Support of Appellant.

**STRINE**, Chief Justice:

The Supplemental Nutrition Assistance Program ("SNAP") is a public benefits program funded by the federal government and governed by federal regulations but administered on a day-to-day basis in substantial part by the states. Designed to "alleviate . . . hunger and malnutrition,"[1] SNAP provides low-income households with electronic payment cards—formerly called "food stamps"—which they can use to buy food. Like many federal benefits programs, a household's eligibility for SNAP is subject to limitations under federal law.

In this case, a SNAP recipient, Cindy Gonzalez, was found to have defrauded the federal government of $6,159 worth of SNAP benefits by representing that she lived alone and did not receive any income, when in fact she was not living alone and was receiving income. After discovering this wrongdoing, the Delaware Department of Health and Social Services ("DHSS") brought an administrative proceeding against Gonzalez to disqualify her from continued participation in SNAP and claw back the benefits she received through her misrepresentations. The hearing officer found that DHSS had established intentional program violations and disqualified Gonzalez from continued participation in SNAP for one year, and DHSS's audit and recovery arm assessed an overpayment of $6,159, which the federal government has started to collect by offsetting the other federal benefits she receives against her SNAP obligations.

---

[1] 7 U.S.C. § 2011.

About five months after the DHSS final decision, the State of Delaware brought a civil action in the Superior Court against Gonzalez under Delaware common law and the Delaware False Claims and Reporting Act based on the same circumstances underlying the DHSS administrative proceeding. This time, however, the State sought between approximately $200,000 and $375,000 in restitution, damages, and penalties; attorneys' fees and costs; and an order enjoining Gonzalez from participating in SNAP until she pays the judgment. Gonzalez in turn filed an answer asserting an affirmative defense that federal law preempts the State's Delaware law claims, and the State moved for judgment on the pleadings. The Superior Court granted the State's motion, holding that federal law did not preempt the State's claims. Gonzalez brings an interlocutory appeal from that determination.

We reverse because federal law prohibits the State from bringing consecutive administrative and civil actions against a SNAP recipient based on the same fraud. Under our system of government, federal law is "the supreme Law of the Land."[2] In this case, the United States Congress passed a law that gives its state partners in SNAP a choice of different enforcement options, but requires states to pick one or the other: "Each State agency shall proceed against an individual alleged to have engaged in [food benefits fraud] *either* by way of administrative hearings . . . *or* by referring such matters to appropriate authorities for civil or criminal action in a court

---

[2] U.S. CONST. art. VI, cl. 2.

of law."[3] The relevant statutory history and administrative interpretations of that provision confirm the most facially reasonable reading of the statute, which is that Congress intended to use the word "or" in an exclusive sense. That is, a state can proceed through "either" an administrative hearing "or" an action in court, but not both. Here, DHSS already obtained a final decision against Gonzalez in an administrative setting, which bars the State from proceeding against her again in court, notwithstanding any state law to the contrary.

## I.

### A.

Unless otherwise noted, the facts of this case are drawn from the pleadings in the Superior Court and are not in material dispute. Around June 2013, Gonzalez submitted an electronic application for SNAP benefits to DHSS,[4] which is the state agency that administers Delaware's implementation of the program. On her application, Gonzalez indicated that she lived alone and received $536.50 in monthly assistance from her mother. In later application renewals and periodic reports, Gonzalez indicated that she continued to live alone and had no income, except Social

---

[3] 7 U.S.C. § 2015(b)(2) (emphasis added).
[4] The pleadings distinguish between the different arms of DHSS, such as the Division of Social Services for application processing and the Audit and Recovery Management Services subdivision for DHSS's investigative work. For the sake of simplicity, we refer to all these divisions and subdivisions as simply "DHSS."

3

Security benefits that she started receiving in 2016. Gonzalez kept telling DHSS that she was living alone until at least October 2016.

But a DHSS investigation uncovered evidence that Gonzalez had not lived alone and had received additional household income. On October 29, 2014, Gonzalez got married, and according to DHSS, Gonzalez's landlord told agency investigators that Gonzalez had been living with her spouse since 2011 and with her mother since 2014. According to DHSS, further investigation produced more evidence that Gonzalez and her spouse lived together.

Following its investigation, DHSS brought an administrative proceeding against Gonzalez seeking to disqualify her from receiving future SNAP benefits. In that proceeding, DHSS alleged fraud and intentional program violations due to Gonzalez's falsification of her SNAP submissions by claiming she lived alone and received no income, when in fact she lived with other people and did receive income. On August 18, 2017, after holding a hearing during which Gonzalez was not represented by counsel,[5] the hearing officer issued a final decision finding that DHSS had established fraud through clear and convincing evidence and disqualifying Gonzalez from receiving SNAP benefits for one year. Gonzalez did not file an appeal from that decision. DHSS then assessed a $6,159 overpayment, which was the total value of the SNAP benefits Gonzalez received as a result of her

---

[5] Opening Br. at 1.

4

misrepresentations. According to Gonzalez, the federal government has started collecting that money by withholding her other federal benefits.[6]

### B.

After knowing that Gonzalez had not appealed and that DHSS's decision against her had become final,[7] the State of Delaware brought a civil action in the Superior Court against Gonzalez seeking monetary damages and civil penalties under Delaware common law and the Delaware False Claims and Reporting Act. The State's complaint was based on the same factual allegations as the prior DHSS action, but this time, the State was asking for a lot more money: $6,159 in restitution, $18,477 in statutory treble damages, and between $5,500 and $11,000 in statutory civil penalties for each of the 32 false statements and fraudulent claims described in the complaint. In total, that adds up to between about $200,000 and $375,000. Additionally, the State sought attorneys' fees and costs and to enjoin Gonzalez from applying for or receiving SNAP benefits until she pays the judgment that the court imposes. In fact, the State sought to collaterally use the administrative hearing officer's factual findings against Gonzalez, asserting in its complaint that "[l]iability

---

[6] *Id.*; *see also* App. to Opening Br. at A75–76 (notice from the U.S. Department of the Treasury informing Gonzalez that Treasury will withhold up to 15 percent of her Social Security benefits).

[7] *See* 31 *Del. C.* § 520 (giving a recipient of public assistance benefits against whom an administrative hearing decision has been decided 30 days from the final administrative decision to file an appeal with the Superior Court); 16 Del. Admin. C. § 2023.5(8) (precluding any administrative appeal after an adverse administrative disqualification hearing).

5

and intent in this matter are established by the [administrative disqualification hearing] decision pursuant to 6 *Del. C.* § 1204(f)."[8]

In response, Gonzalez filed an answer asserting an affirmative defense that the federal statute that created SNAP, the Food and Nutrition Act of 2008,[9] preempts the State's claims.[10]

The State then moved for judgment on the pleadings, which Gonzalez opposed on preemption grounds.[11] In essence, Gonzalez argued that there was either a specific conflict between the Food and Nutrition Act and the State's action against her or a more general conflict based on the notion that the State's action stands as an obstacle to the execution of Congress's intent.[12] The State denied that there was any preemption.

The Superior Court granted the State's motion, holding that federal law did not preempt the State's claims, and referred the case to a Superior Court Commissioner for a hearing to determine the amount of fees and costs due under the Delaware False Claims and Reporting Act.[13]

---

[8] App. to Opening Br. at A16 (Complaint).

[9] 7 U.S.C. §§ 2011 *et seq.*

[10] App. to Opening Br. at A39 (Answer). At oral argument, counsel for Gonzalez stated that the underlying facts are not in dispute, except to the extent that they indicate criminal liability.

[11] Gonzalez also asserted that each separate false statement would not provide the basis for a separate False Claims and Reporting Act count, but that argument is not at issue in this appeal.

[12] App. to Opening Br. at A68–71 (Def.'s Resp. to Pl.'s Mot. for J. on the Pleadings).

[13] *State v. Gonzalez*, 2018 WL 3655705, at *3–4 (Del. Super. Ct. July 19, 2018). The Superior Court concluded that Gonzalez had "admitted all factual allegations in the Answer." *Id.* at *1. In reality, Gonzalez admitted to having represented that she lived alone and did not receive income

In ruling for the State, the Superior Court relied primarily on a federal regulatory provision promulgated under the Food and Nutrition Act by the federal agency responsible for implementing that statute, the Food and Nutrition Service, to govern court referrals by state agencies that are exempt from establishing an administrative disqualification system.[14]  In particular, the court emphasized a provision in that regulation that requires exempt state agencies to "encourage State and local prosecutors to recommend to the courts that a disqualification penalty as provided in [the Food and Nutrition Act] be imposed in addition to any other civil or criminal penalties for such violations."[15]  The trial court viewed that provision as

---

for much of the relevant time, but she did not admit to having lived with anyone else in her household or receiving unreported income. *See, e.g.*, App. to Opening Br. at A47 (Answer) ("Defendant is without sufficient knowledge to be able to admit or deny with regard to 'additional evidence that Clark and Gonzalez lived together,' except that she denies that 'information made publicly available on the Internet by Defendant' proves such an allegation.").  She also denied having "knowingly" made any misrepresentation regarding her income and household composition. *Id.* at A50 (denying having "knowingly submitted falsified claims . . . by knowingly misstating her income and household composition" or having "knowingly presented, or caus[ing] to be presented . . . false or fraudulent claims").  It is possible that the Superior Court was using the hearing officer's factual findings against Gonzalez collaterally, although the Superior Court's opinion is unclear on this point.  Nevertheless, Gonzalez's response to the State's motion for judgment on the pleadings below raised only the preemption issue and another legal issue that is not at issue here, and on appeal, Gonzalez does not challenge the Superior Court's conclusion that she "admitted all factual allegations in the Answer." *Gonzalez*, 2018 WL 3655705, at *1.  We therefore address only the preemption issue.

[14] 7 C.F.R. § 273.16(g) ("Any State agency exempted from the requirement to establish an administrative disqualification system in accordance with paragraph (a) of this section shall refer appropriate cases for prosecution by a court of appropriate jurisdiction in accordance with the requirements outlined in this section.").

[15] *Gonzalez*, 2018 WL 3655705, at *3 (quoting 7 C.F.R. § 273.16(g)(1)(ii)) (emphasis and internal quotation marks omitted).

7

"contemplat[ing] additional remedies the state can seek in addition to an administrative disqualification hearing."[16]

The Superior Court also cited a U.S. District Court decision, *United States v. Byrd*,[17] which involved a merchant who allegedly violated the federal False Claims Act by illegally redeeming food stamp coupons, to support its position. Although *Byrd* did not consider the preemption issue and involved a merchant who redeemed food stamps (as opposed to a food stamp recipient),[18] the Superior Court agreed with the State that "it is difficult to understand why the government could not bring a state False Claims Act claim against the Defendant but could bring a federal False Claims Act against the Defendant."[19]

After the Superior Court's decision, Gonzalez sought interlocutory review of the court's decision granting judgment on the pleadings to the State, which the Superior Court certified and this Court granted.

---

[16] *Id.*

[17] 100 F. Supp. 2d 342 (E.D.N.C. 2000).

[18] *See id.* at 343.

[19] *Gonzalez,* 2018 WL 3655705, at \*3 (quoting Pl.'s Mot. for J. on the Pleadings) (internal quotation marks omitted).

8

## II.

This Court reviews the Superior Court's decision granting judgment on the pleadings *de novo* "to determine whether the court committed legal error in formulating or applying legal precepts."[20]

## III.

On appeal, Gonzalez's main argument is that the Food and Nutrition Act preempts the State's claims against her because the Act prohibits states from bringing consecutive administrative and civil actions based on the same intentional program violations.[21] Specifically, she points to § 6(b)(2) of the Act, which requires each state agency to "proceed against an individual alleged to have engaged in [an intentional program violation] *either* by way of administrative hearings, after notice

---

[20] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1204 (Del. 1993).

[21] At oral argument, Gonzalez's counsel focused exclusively on this argument. In her briefing, she also made two additional arguments. First, Gonzalez claimed that by creating a detailed and comprehensive scheme for determining participant eligibility, disqualification, and recoupment of overissued benefits, Congress intended "to occupy [the] entire field of regulation as to state activities relating to SNAP program participants." Opening Br. at 20–25. Such field preemption, Gonzalez submitted, completely bars the State from assessing disqualification periods or financial penalties in excess of those provided for by federal law. Second, she argued that the State's imposition of enormous fraud penalties for an intentional program violation "would 'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives' of SNAP—to provide nutrition assistance to low-income individuals." *Id.* at 20, 33–35. To that point, Gonzalez contended that the penalties sought by the State—"damages in an amount of nearly fifty times the value of the SNAP benefits she has already been ordered to repay, and an ongoing bar from participation in SNAP until repayment of this sum"—would serve only as "a cudgel to threaten tens of thousands of dollars in liability from low-income SNAP program participants." *Id.* at 33–35. Because we reverse on the basis of her first theory of preemption, we need not address these other theories.

9

and an opportunity for a hearing at the State level, *or* by referring such matters to appropriate authorities for civil or criminal action in a court of law."[22] Gonzalez interprets that language to mean that Congress intended to allow states to proceed either administratively or in court, but not both. Here, she argues, the State was precluded from proceeding against her in court because DHSS had already successfully proceeded against her in an administrative setting.

In response, the State's briefing seems to suggest that the "either/or" language in § 6(b)(2) should be read inclusively, giving the government the discretion to proceed administratively using the Food and Nutrition Act's disqualification and recoupment provisions, in court under state law, or through both means.[23] Additionally, the State claims that "two state agencies are involved in this matter"—DHSS and the Delaware Department of Justice ("DDOJ")—and that the DDOJ "is not bound by whatever requirements of the [Food and Nutrition Act]" there may be that bind DHSS.[24] Clarifying this position at oral argument, the State asserted that § 6(b)(2) applies to only "one state agency"—defined by the Act to be "the administering agency administering the SNAP program"—which shows that "Congress intended to preclude actions by the administering agency but not by other

---

[22] 7 U.S.C. § 2015(b)(2) (emphasis added); Opening Br. at 20–23.
[23] *See* Answering Br. at 15–16 ("That language [in § 6(b)(2)] does not preclude Delaware from pursuing its chosen method of resolving the issue of the fraud committed by Gonzalez. Rather than simply suing Gonzalez under the [Delaware False Claims and Reporting Act] . . . , Delaware opted to avail itself of an [administrative disqualification hearing] first . . . .").
[24] *Id.* at 25.

10

agencies."[25]  In other words, the State views § 6(b)(2) as binding only the state agency charged with overseeing SNAP—DHSS—and leaving the rest of the state government free to proceed as it wishes.[26]

Under the Supremacy Clause of the United States Constitution, "federal law preempts contrary state law."[27]  In general, the types of preemption recognized by federal courts can divided into three categories: express preemption, field preemption, and conflict preemption.[28]  Express preemption occurs when Congress preempts state law "in express terms."[29]  Field and conflict preemption, by contrast, take a more contextual approach.  Field preemption exists "when it is clear, despite the absence of explicit preemptive language, that Congress has intended, by legislating comprehensively, to occupy an entire field of regulation and has thereby

---

[25] Oral Argument Video at 14:37–15:00.  *See also* 7 U.S.C. § 2012(s) (defining "State agency" as "the agency of State government, including the local offices thereof, which has the responsibility for the administration of the federally aided public assistance programs within such State, and in those States where such assistance programs are operated on a decentralized basis, the term shall include the counterpart local agencies administering such programs").

[26] Asked whether the State's view was that "Congress only wants to control the actual entity that would have a role under the program, leaving everyone else free to do whatever they wanted," counsel for the State replied: "Correct, Your Honor."  Oral Argument Video at 16:10–25.

[27] *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288, 1297 (2016).

[28] *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (explaining that "[e]ven without an express provision for preemption, we have found state law to be preempted by Congressional legislation in at least two circumstances," including "[w]hen Congress intends federal law to occupy the field" and when there is a conflict between state law and a federal statute (internal quotation marks omitted)); Thomas H. Sosnowski, *Narrowing the Field: The Case Against Implied Preemption of State Product Liability Law*, 88 N.Y.U. L. Rev. 2286, 2294–96 (2013) (dividing preemption into "express preemption" and two types of "implied preemption": field and conflict preemption).

[29] *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).

11

'left no room for the States to supplement' federal law."[30]  As for conflict preemption, "even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute."[31]  Thus, conflict preemption exists "when compliance with both state and federal law is impossible, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress."[32]  But these "categories of preemption are not rigidly distinct,"[33] and "the ultimate touchstone" in every preemption case involving a federal statute is "the purpose of Congress."[34]  Courts should not "rely on a talismanic pre-emption vocabulary."[35]

Because the text, statutory history, and relevant regulatory interpretations of the Food and Nutrition Act demonstrate that Congress intended to require states to choose between an administrative hearing and court when proceeding against an individual for fraud in obtaining SNAP benefits, we hold that federal law preempts the State's claims in this case.

---

[30] *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984) (quoting *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).
[31] *Crosby*, 530 U.S. at 372.
[32] *Capital Cities*, 467 U.S. at 699 (internal citations and quotation marks omitted).
[33] *Crosby*, 530 U.S. at 372 n.6 (internal quotation marks omitted).
[34] *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288, 1297 (2016) (internal quotation marks omitted).
[35] *Id.* at 1300 (Sotomayor, J., concurring); *cf. id.* at 1300–01 (Thomas, J., concurring in part and concurring in the judgment) (endorsing a preemption analysis based on "the text and structure" of the federal statute at issue).

## A.

Starting with the statutory text, the provision that Gonzalez relies on is tied to the Food and Nutrition Act's disqualification penalties for fraud, misrepresentation, and other intentional program violations, including violations of state statutes, that are committed "for the purpose of using, presenting, transferring, acquiring, receiving, or possessing program benefits."[36]  The Act provides that any person found by a state or federal court or administrative agency to have committed one of these intentional programs violations will be disqualified from further participation in SNAP, with the length of the disqualification depending on whether the person is a repeat offender and on the type of violation.[37]  The provision that Gonzalez relies on, § 6(b)(2), goes on to provide:

> Each State agency shall proceed against an individual alleged to have engaged in [activity constituting an intentional program violation] *either* by way of administrative hearings, after notice and an opportunity for a hearing at the State level, *or* by referring such matters to appropriate authorities for civil or criminal action in a court of law.[38]

Thus, when a SNAP participant commits an intentional program violation—broadly defined to include both outright fraud and other intentional violations related to

---

[36] 7 U.S.C. § 2015(b)(1).

[37] *See id.* § 2015(b)(1)(i) (one year on first violation); *id.* § 2015(b)(1)(ii) (two years on second violation or first violation involving the trading of a controlled substance for benefits); *id.* § 2015(b)(1)(iii) (permanently on third violation, second violation involving the trading of a controlled substance for benefits, or first violation in certain other cases).

[38] *Id.* § 2015(b)(2) (emphasis added).

13

SNAP—the state agency must proceed against that participant either by way of an administrative hearing or by referring the case to appropriate authorities for a civil or criminal action in court. The Act and its implementing regulations also require state agencies to collect the overissued benefits on behalf of the federal government,[39] with the state retaining 35% of the amount collected.[40]

Absent the use of the word "either," § 6(b)(2) could conceivably be read in one of two ways: (1) a state agency can proceed either administratively or in court, but not both (the *exclusive* use of "or"); or (2) a state agency can proceed administratively, in court, or through both means (the *inclusive* use of "or"). As scholars and other courts have recognized, drafters of legal text, like ordinary humans, can use the word "or" in either sense.[41] For example, if a waiter says that

---

[39] *See* 7 U.S.C. § 2022(b) (requiring state agencies to "collect any overissuance of benefits issued to a household"); 7 C.F.R. § 273.18(c) (setting forth the criteria for the amount to collect); *id.* § 273.18(a)(2) (providing that a "claim is a Federal debt"); *id.* § 273.18(l) (requiring states to send the federal government "the value of funds collected").

[40] 7 C.F.R. § 273.18(k)(1) (giving the state 35% for intentional program violations, 20% for inadvertent household errors, 35% for inadvertent household errors by reducing the person's unemployment compensation benefit, and nothing for state agency errors).

[41] *See, e.g.*, *Hansen v. U.S. Bank, Nat'l Ass'n*, 2016 WL 7105865, at *4 (D. Idaho Dec. 5, 2016) ("[A] disjunctive 'or' can come in both *exclusive* and *inclusive* forms. When used in the exclusive disjunctive sense, 'or' indicates that one or the other of the listed things can be true, but not both. When used in the inclusive disjunctive sense, 'or' indicates that one or more of the listed things can be true."); *Burke v. State ex rel. Dep't of Land Conservation & Dev.*, 290 P.3d 790, 794 (Or. 2012) ("To say that 'or' is 'disjunctive' is true enough. But authorities agree that a disjunctive connector can have either an 'inclusive' or an 'exclusive' sense. Thus, 'A or B' can mean one or the other, but not both. But it can also mean one or the other, or both." (citing BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 624 (2d ed. 1995)); *DietGoal Innovations LLC v. Chipotle Mex. Grill, Inc.*, 2015 WL 164072, at *3 (E.D. Tex. Jan. 13, 2015) ("It is well recognized that the word 'or' can be used in either an inclusive or an exclusive sense, depending on context. That is, the term 'or' can mean 'A or B, but not both,' or it can mean 'A or B, or both.'" (internal citations omitted); Layman E. Allen, *Symbolic Logic: A Razor-Edged Tool for Drafting and*

14

the breakfast special comes with either coffee or tea, he is probably using "or" exclusively—the meal doesn't come with *both*. But if that same waiter tells his manager that he will quit his job unless he receives a raise or more vacation time, he is probably using "or" inclusively—he would be happy to receive a raise, more vacation time, or both. Given these varying uses of "or," "[t]he intended meaning must be interpreted from context."[42]

But in this instance, Congress used the word "either" in concert with "or." The statute's use of the "either/or" construct suggests that Congress intended to use "or" in the exclusive sense (*i.e.*, "P or Q, but not both"). In ordinary English, the phrase "P or Q" on its own often suggests the inclusive sense of "or," but the addition of the word "either" before "P or Q" weighs toward the exclusive use.[43] This

---

*Interpreting Legal Documents*, 66 YALE L.J. 833, 842–48 (1957) (distinguishing between exclusive and inclusive disjunctions); E. Allan Farnsworth, *"Meaning" in the Law of Contracts*, 76 YALE L.J. 939, 955 (1967) (describing the ambiguity "between 'or' as an exclusive disjunctive (P *or else* Q, *but not both*) and as an inclusive disjunctive (P *or else* Q, *or else both*)").

[42] *Hansen*, 2016 WL 7105865, at *4; *accord DietGoal*, 2015 WL 164072, at *3; *Lake v. Woodcreek Homeowners Ass'n*, 243 P.3d 1283, 528 (Wash. 2010).

[43] *See* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 399 (1988) (defining the conjunction "either" as "a function word [used] before two or more coordinate words, phrases, or clauses joined usu. by *or* to indicate that what immediately follows is the first of two or more alternatives" and the noun "either–or" as "an unavoidable choice or exclusive division between only two alternatives"); *Delfani v. U.S. Capitol Guide Bd.*, 2005 WL 736644, at *4 & n.4 (D.D.C. Mar. 31, 2005), *aff'd*, 198 F. App'x 9 (D.C. Cir. 2006) (considering "either . . . or" language and holding that it provided two mutually exclusive alternatives); *Nat'l Neighbors, Inc. v. United States*, 839 F.2d 1539, 1542 (Fed. Cir. 1988) (describing "the binding election of forums" that a government contractor may use to challenge a contracting officer's decision as "an 'either-or' alternative" that "does not provide a contractor with dual avenues for contesting a contracting officer's adverse decision"); *Turner v. Precision Surgical, L.L.C.*, 274 S.W.3d 245, 250 (Tex. Ct. App. 2008) (using the phrase "either/or question" to describe a "question posed in a manner that necessarily prevents the two factual alternatives inquired about from being found to exist" (internal quotation marks omitted)).

understanding of the "either/or" construct finds support in the U.S. District Court for the District of Columbia's decision in *Delfani v. U.S. Capitol Guide Board*,[44] where the court considered whether it had subject matter jurisdiction over employment discrimination claims brought by a former employee of the federal government. The plaintiff in that case was bringing her claims under the Congressional Accountability Act, which "permits an employee to '*either* (1) file a complaint with the Office [of Compliance] . . . *or* (2) file a civil action.'"[45] Before filing suit in the district court, the plaintiff had filed an administrative complaint with the Office of Compliance.[46] Reasoning that "the statute plainly requires an employee to make a choice between alternatives, and therefore forecloses the possibility of parallel proceedings in both administrative and adjudicative fora," the district court dismissed the plaintiff's claims for lack of subject matter jurisdiction.[47] The D.C. Circuit affirmed the district court's decision on appeal, reasoning that "[t]he district court lacked subject matter jurisdiction because the plaintiff had an administrative complaint pending when she filed this civil action."[48]

---

[44] 2005 WL 736644.

[45] *Id.* at *4 (alteration and emphasis in original) (quoting 2 U.S.C. §§ 1404, 1408).

[46] *Id.* at *1.

[47] *Id.* at *4–5.

[48] *Delfani*, 198 F. App'x at 9.

To the extent that the current statutory text can conceivably be viewed as ambiguous, the history of the statutory text of § 6(b)[49] dispositively shows that Congress intended to make state agencies choose between one forum or the other. Before 1981, the relevant language in § 6(b) provided:

> Each State agency shall proceed against such alleged fraudulent activity either by way of administrative fraud hearings in accordance with clause (1) of this subsection or by referring such matters to appropriate legal authorities for civil or criminal action in accordance with clause (2) of this subsection, *or both*.[50]

The use of the "or both" language in that version of § 6(b) makes clear that, before 1981, Congress intended to use "or" in the inclusive sense. That is, Congress wanted to allow states to proceed against an individual in a single forum "or both." But in 1981, things changed when, in the Omnibus Budget Reconciliation Act of 1981, Congress amended § 6(b) to strike the "or both" language, with the provision now reading:

> Each State agency shall proceed against an individual alleged to have engaged in [activity constituting an

---

[49] Some commentators have distinguished between "statutory history" and "legislative history," elevating the former above the latter. Justice Scalia and Professor Bryan Garner, for example, have explained that they "oppose the use of legislative history, which consists of the hearings, committee reports, and debate leading up to the enactment in question . . . [b]ut quite separate from legislative history is *statutory* history—the statutes repealed or amended by the statute under consideration." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 256 (2012) (emphasis in original). In Justice Scalia and Garner's view, this statutory history "form[s] part of the context of the statute, and (unlike legislative history) can properly be presumed to have been before all the members of the legislature when they voted," and thus "a change in the language of a prior statute presumably connotes a change in meaning." *Id.*

[50] Food Stamp Act Amendments of 1980, Pub. L. No. 96-249, 94 Stat. 357, § 109 (1980) (emphasis added) (amending Section 6(b) of the Food Stamp Act of 1977).

intentional program violation] either by way of administrative hearings, after notice and an opportunity for a hearing at the State level, or by referring such matters to appropriate authorities for civil or criminal action in a court of law.[51]

That language is the same, word for word, as the statute's current language.

If we are to give any effect to Congress's removal of the "or both" language—as fundamental principles of statutory interpretation suggest we must[52]—the amended statute has to be read as requiring states to "either" choose one forum "or" the other, but not "both."

### B.

Although the statutory text and history alone are clear enough to resolve this question, we note that our interpretation—that Congress intended to limit states to a single forum for any given case of SNAP fraud—is also supported by the Food and

---

[51] Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, 95 Stat. 357, § 112 (1981) (amending Section 6(b) of the Food Stamp Act of 1977). In the version of the 1981 omnibus bill that originally passed the House of Representatives, the relevant language was still identical to the previous version of § 6(b) (*i.e.*, each state agency was required to proceed administratively, in court, or through both means). *See* Omnibus Budget Reconciliation Act of 1981, H.R. 3982, 97th Cong., 1st Sess., § 1012 (1981) (version placed on the calendar July 8). Congress ultimately rejected that language and instead adopted the Senate's proposed amendments to § 6(b), which omitted the "or both" language. *See* Omnibus Reconciliation Act of 1981, S. 1377, 97th Cong. 1st Sess., § 161 (1981) (version passed the Senate June 25).

[52] *See, e.g.*, *Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."); *Ross v. Blake*, 136 S. Ct. 1850, 1857–58 (2016) (reasoning that the statute's history confirmed the Court's textual reading); *United States v. Brown*, 333 U.S. 18, 25 (1948) (interpreting a statutory amendment to have "broaden[ed] the Act's coverage" because "[o]therwise there would be no reason for or meaning in the change"); SCALIA & GARNER, *supra*, at 256 ("[A] change in the language of a prior statute presumably connotes a change in meaning.").

Nutrition Service's explanation of the food stamp rulemaking it finalized in 1983, less than two years after the 1981 omnibus legislation that amended § 6(b). Explaining the final rule's provisions regarding administrative responsibility for seeking disqualification penalties for intentional program violations, the Service noted that its previous regulation had "clarifi[ed] that administrative fraud hearings can be conducted regardless of whether other legal action is planned against the household member."[53] But the Service deleted that provision "to reflect a change in the language of the statutory requirement governing State agency action in pursuit of cases of alleged Program abuse."[54] Specifically, the Service explained:

> [W]hereas the [predecessor statute to the Food and Nutrition Act][55] previously mandated State agency proceedings against individuals alleged to have committed fraud either by way of administrative hearings or by referring such matters to appropriate legal authorities, or both . . . , the language was amended by the Omnibus Budget Reconciliation Act of 1981 . . . to simply require that the proceedings be either by way of administrative hearings or referrals to appropriate legal authorities. . . . *We continue to believe that Congress intended to prevent the State agency from pursuing the same case of alleged Program abuse by way of both an administrative hearing*

---

[53] Food Stamp Program; Disqualification Penalties for Intentional Program Violation, and Improved Recovery of Overpayments, 48 Fed. Reg. 6836, 6840 (Feb. 15, 1983) (to be codified at 7 C.F.R. pts. 272, 273, 276, 277).

[54] *Id.*

[55] Before 2008, the Food and Nutrition Act was called the Food Stamp Act of 1977. *See* Food and Nutrition Service, A Short History of SNAP, https://www.fns.usda.gov/snap/short-history-snap (last visited Feb. 27, 2019) ("In efforts to fight stigma, the law changed the name of the Federal program to the Supplemental Nutrition Assistance Program or SNAP as of October 1, 2008, and changed the name of the Food Stamp Act of 1977 to the Food and Nutrition Act of 2008.").

> *and referral for prosecution when the language of the statute was changed.*[56]

As the italicized language makes clear, the Food and Nutrition Service viewed Congress's decision to delete the "or both" language from § 6(b) as an attempt to prevent states from bringing one case in an administrative hearing and another one in court when the two cases are based on the same fraud. Even if we were to find the text of § 6(b)(2) ambiguous, the Food and Nutrition Service—the federal agency charged with administering the Food and Nutrition Act—reads the statute in exactly the same manner we have concluded is the most facially reasonable interpretation of the statute.[57]

The text and structure of the Service's regulation governing disqualification for intentional program violations highlight this. Consistent with the statutory language, the regulation makes each state agency "responsible for investigating any case of alleged intentional Program violation, and ensuring that appropriate cases are acted upon either through administrative disqualification hearings or referral to a court of appropriate jurisdiction in accordance with the procedures outlined in [the regulation]."[58] Then, in detailing the specific circumstances under which agencies

---

[56] Food Stamp Program, 48 Fed. Reg. at 6840 (emphasis added)

[57] *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) ("*Chevron* directs courts to accept an agency's reasonable resolution of an ambiguity in a statute that the agency administers.").

[58] 7 C.F.R. § 273.16(a)(1).

should bring administrative disqualification hearings versus legal actions in court, the regulation indicates that states should choose between one or the other:

> The State agency should conduct administrative disqualification hearings in cases in which the State agency believes the facts of the individual case do not warrant civil or criminal prosecution through the appropriate court system, in cases previously referred for prosecution that were declined by the appropriate legal authority, and in previously referred cases where no action was taken within a reasonable period of time and the referral was formally withdrawn by the State agency. The State agency shall not initiate an administrative disqualification hearing against an accused individual whose case is currently being referred for prosecution or subsequent to any action taken against the accused individual by the prosecutor or court of appropriate jurisdiction, if the factual issues of the case arise out of the same, or related, circumstances.[59]

That language contemplates administrative actions being brought in addition to lawsuits in court only under limited circumstances: (1) "in cases previously referred for prosecution that were declined by the appropriate legal authority"; and (2) "in previously referred cases where no action was taken within a reasonable period of time and the referral was formally withdrawn by the State agency."[60] Critically, each of those circumstances involves a situation where the court action *is not completed*. Indeed, the regulation provides that "[t]he State agency *shall not* initiate an administrative disqualification hearing against an accused individual" at the same

---

[59] *Id.*
[60] *Id.*

time as or after a case against that person in court "if the factual issues of the case arise out of the same, or related, circumstances."[61]  Here, the State is essentially trying to do the reverse: obtain relief in an administrative action first and, after that action is successful, then bring a lawsuit in court.  Indeed, the State waited to bring its civil lawsuit until after the deadline for appealing the administrative determination had passed.[62]

## C.

This interpretation of § 6(b)(2) also makes sense as a matter of congressional policy.  Under federal law, administrative disqualification hearings take place on an expedited basis and are more informal than civil actions in court, with state-level hearings and decisions being required to occur within 60 days of the request for a hearing and households being granted only one 30-day extension.[63]  That gives a beneficiary like Gonzalez less of an opportunity to contest the charges than she would get in court, where she could file motions,[64] obtain more extensive

---

[61] *Id.* (emphasis added).

[62] *See* 31 *Del. C.* § 520 (setting a 30-day deadline).

[63] *See* 7 C.F.R. § 273.15(c)(1) ("Within 60 days of receipt of a request for a fair hearing, the State agency shall assure that the hearing is conducted, a decision is reached, and the household and local agency are notified of the decision."); *id.* § 273.15(c)(4) ("The household may request and is entitled to receive a postponement of the scheduled hearing. The postponement shall not exceed 30 days and the time limit for action on the decision may be extended for as many days as the hearing is postponed.").

[64] *See* Del. Super. Ct. R. 12.

discovery,[65] and get a full trial (possibly by jury).[66]  And even more importantly, there is less of an *incentive* to contest the charges because the worst that could seemingly happen is disqualification under § 6(b) and an obligation to pay back the overissued benefits.  For a first-time offender like Gonzalez, that result would not turn her life permanently upside down: she would only be disqualified from receiving SNAP benefits for one year and have to pay back the $6,159 in overissued benefits she received.  Given those consequences, paying for an attorney—if Gonzalez could even afford one—may not be worth it, and resource-constrained legal aid organizations might not take on her case.  Indeed, Gonzalez was unrepresented in the administrative hearing and did not file an appeal.  That is not surprising given the apparent low stakes.

As the facts of this case illustrate, however, a final, adverse ruling in an administrative proceeding could have substantially greater consequences if the State can use that ruling collaterally by bringing a follow-on fraud suit in court, such as Delaware is trying to do here.  In its complaint in this case, the State asserted that "[l]iability and intent in this matter are established by the [administrative disqualification hearing] decision pursuant to 6 *Del. C.* § 1204(f)."[67]  The State repeated this claim in its motion for judgment on the pleadings, arguing that

---

[65] *See* Del. Super. Ct. R. 26.

[66] *See* Del. Super. Ct. R. 38, 39.

[67] App. to Opening Br. at A16 (Complaint).

Gonzalez was "without legal basis to challenge the factual findings of the Fair Hearing Officer" in the prior administrative action,[68] and has done so again on appeal, claiming that the administrative hearing "created dispositive factual findings for use in a subsequent [Delaware False Claims and Reporting Act] lawsuit."[69] In essence, the State is trying to use the prior administrative action as a form of offensive collateral estoppel. Given Gonzalez's limited ability and incentive to put up a vigorous defense in that administrative action, however, it would arguably be unfair to use the hearing officer's factual findings against her in a later action where the consequences are much starker: a judgment of around $200,000 to $375,000, plus the State's attorneys' fees and costs and what would probably amount to lifetime ban on receiving SNAP benefits.[70]

For these reasons, we find it improbable that Congress intended for a summary administrative disqualification hearing—which should theoretically result in only a one-year disqualification and a few thousand dollars in liability—to bind a low-

---

[68] *Id.* at A57 (Pl.'s Mot. for J. on the Pleadings) ("[U]nder the [Delaware False Claims and Reporting Act], the Defendant is without legal basis to challenge the factual findings of the Fair Hearing Officer who issued a decision in this matter on August 18, 2017.").

[69] Answering Br. at 15.

[70] *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330 (1979) (observing that the offensive use of collateral estoppel "may be unfair to the defendant" where the "defendant in the first action is sued for small or nominal damages" because "he may have little incentive to defend vigorously, particularly if future suits are not foreseeable"); *Berner v. British Commonwealth Pac. Airlines, Ltd.*, 346 F.2d 532, 538–41 (2d Cir. 1965) (reasoning that it would be unfair to apply collateral estoppel where the defendant did not appeal a $35,000 judgment and was later sued for about $7 million in damages).

income individual in a later civil action that may result in a lifetime disqualification and hundreds of thousands of dollars in liability that won't be dischargeable in bankruptcy.[71]

### D.

The regulatory provisions cited by the Superior Court below and by the State on appeal must, of course, give way to Congress's clear intent in requiring states to proceed either administratively or in court, but not both.  But in any event, these provisions do not undermine our analysis.  To start, 7 C.F.R. § 271.4(b), entitled "Claims delegation," does not delegate authority to the State to bring a fraud action under state law in addition to administrative disqualification and recoupment.  This provision "delegates to the State agency, subject to the standards in § 273.18, the authority to determine the amount of, and settle, adjust, compromise or deny all or part of any claim which results from fraudulent or nonfraudulent overissuances to participating households."[72]  Observing that the provision "speaks to the ability of state agencies to pursue collection efforts," the trial court found the language "to be squarely on point in this matter and . . . quite persuasive."[73]  On appeal, the State further characterizes this language as giving it "federal authority to pursue

---

[71] *See* 11 U.S.C. § 523(a)(7) ("A discharge [of an individual's debts in bankruptcy] does not discharge an individual debtor from any debt . . . to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than [certain tax penalties] . . . .").

[72] 7 C.F.R. § 241.4(b).

[73] *State v. Gonzalez*, 2018 WL 3655705, at *3 (Del. Super. Ct. July 19, 2018).

alternative remedies for collection efforts."[74]  But for at least two reasons, that language does not permit the State to bring an action under the Delaware False Claims and Reporting Act.  First, the collection of "claims" must be distinguished from bringing an action under state law that will result in penalties being deposited in state coffers.  In the SNAP context, "claims" are explicitly defined to be "a Federal debt," which the state agency must collect *on behalf of the federal government*.[75] Here, by contrast, counsel for the State candidly admitted at oral argument that any funds collected under the Delaware False Claims and Reporting Act would go to Delaware's General Fund.[76]  Second, the regulation explicitly makes the delegation of authority "subject to the standards in § 273.18,"[77] and § 273.18 sets forth formulas for determining the amounts of claims that cap claims like those in this case at basically the value of the overissued benefits.[78]  If anything, this provision *supports* the argument for preemption.

---

[74] Answering Br. at 23.

[75] 7 C.F.R. § 273.18(a)(2); *see also* Br. of Amicus Curiae David A. Super at 7 ("When [DHSS] becomes involved in collecting overissuances from households, it is doing so not on its own behalf but rather under a delegation of responsibility from the real party in interest: the federal government.").

[76] Oral Argument Video at 13:27–37 ("It would go to the General Fund, Your Honor.").

[77] 7 C.F.R. § 271.4(b); *see also* Br. of Amicus Curiae David A. Super at 7 ("This delegation is strictly constrained by detailed federal regulations on the computation of claims against households.  These regulations give states some discretion in how to *collect* claims against households but none over the computation of those claims.").

[78] *See* 7 C.F.R. § 273.18(c)(1) (setting forth the procedures for calculating "[c]laims not related to trafficking").

Nor does 7 C.F.R § 273.16(g)(1)(ii) suggest that the State can proceed against a SNAP beneficiary in both an administrative disqualification hearing and a civil action in court. That provision reads:

> State agencies are encouraged to refer for prosecution under State or local statutes those individuals suspected of committing intentional Program violation, particularly if large amounts of food stamps are suspected of having been obtained by intentional Program violation, or the individual is suspected of committing more than one act of intentional Program violation. The State agency shall confer with its legal representative to determine the types of cases which will be accepted for possible prosecution. State agencies shall also encourage State and local prosecutors to recommend to the courts that a disqualification penalty as provided in section 6(b) of the [predecessor statute to the Food and Nutrition Act] be imposed in addition to any other civil or criminal penalties for such violations.[79]

The Superior Court relied on this language to conclude there was no preemption,[80] and the State argues that the provision "appears to contemplate additional remedies beyond an [administrative disqualification hearing] and tax intercepts."[81] In context, however, this provision is far less meaningful than the State insists. As previously discussed, § 273.16 is the regulation that governs disqualification for intentional program violations—the one that implements the Food and Nutrition Act's instruction that states proceed either administratively or in court. But this particular

---

[79] *Id.* § 273.16(g)(1)(ii).
[80] *See State v. Gonzalez*, 2018 WL 3655705, at *3 (Del. Super. Ct. July 19, 2018).
[81] Answering Br. at 24.

language is found in a subsection that carries the title "Court referrals" and sets forth the requirements for state agencies that are "*exempted* from the requirement to establish an administrative disqualification system" and therefore whose only option is to "refer appropriate cases for prosecution by a court of appropriate jurisdiction."[82] In other words, this provision is really intended only for those states that are limited to proceeding in court. Indeed, § 273.16(g)(1)(ii) speaks in terms of prosecutors recommending both disqualification penalties and any other civil or criminal penalties only "to the courts."[83] Nothing in the provision suggests that states may bring one action in an administrative setting and another in court.

Nor do the cases cited by the Superior Court below and the State on appeal support the State's argument against preemption. To start, the State cites three cases[84] in which "the federal False Claims Act has been used to penalize food benefits fraud."[85] But these are cases in which the *federal* government used a *federal* statute to seek penalties. Section 6(b)(2) of the Food and Nutrition Act, by contrast, applies to "State agenc[ies]," not the United States.[86] Congress likely had good reasons for that decision. In collecting overissued claims, state agencies act on

---

[82] 7 C.F.R. § 273.16(g) (emphasis added).

[83] *Id.* § 273.16(g)(1)(ii).

[84] *United States v. Byrd*, 100 F. Supp. 2d 342 (E.D.N.C. 2000); *United States v. Tran*, 11 F. Supp. 2d 938 (S.D. Tex. 1998); *United States v. Truong*, 860 F. Supp. 1137 (E.D. La. 1994). The Superior Court also relied on *Byrd* in its opinion below. *State v. Gonzalez*, 2018 WL 3655705, at *3 (Del. Super. Ct. July 19, 2018).

[85] Answering Br. at 27.

[86] 7 U.S.C. § 2015(b)(2).

behalf of the federal government, who is "the real party in interest" because SNAP benefits are funded entirely by the federal government.[87] As for the other cases cited by the State, none of them deal with the specific issue raised by Gonzalez: whether the Food and Nutrition Act prohibits a state from pursuing one case against a SNAP beneficiary in an administrative action and another in court when the two cases are based on the same program abuse.[88] Indeed, none of these cases even cite § 6(b)(2).

## *E.*

As to the State's argument that § 6(b)(2) restricts only the state agency that is responsible for administering SNAP—and not other parts of state government— there are many problems with this argument. The basic premise of the State's argument is that § 6(b)(2) applies only to "[e]ach State agency,"[89] which the Food and Nutrition Act defines in relevant part to mean only "the agency of State government, including the local offices thereof, which has the responsibility for the administration of the federally aided public assistance programs within such State."[90]

---

[87] Br. of Amicus Curiae David A. Super at 7.

[88] *See* Answering Br. at 28–29; *Dupler v. City of Portland*, 421 F. Supp. 1314 (D. Me. 1976); *Williams v. City of Philadelphia*, 164 A.3d 576 (Pa. Commw. Ct. 2017); *Harrelson v. Butz*, 547 F.2d 915 (4th Cir. 1977); *People v. Triuck*, 669 N.Y.S.2d 1018 (N.Y. Sup. Ct. 1998); *Turner v. Chandler*, 995 P.2d 1062 (Haw. 1998); *State v. Bolar*, 530 N.E.2d 940 (Oh. Ct. App. 1987); *Bazan v. Dep't of Soc. & Health Servs.*, 612 P.2d 413 (Wash. Ct. App. 1980).

[89] 7 U.S.C. § 2015(b)(2).

[90] *Id.* § 2012(s). The Act also defines the term "State agency" to include, "in those States where such assistance programs are operated on a decentralized basis, . . . the counterpart local agencies administering such programs," and "the tribal organization of an Indian tribe determined by the Secretary to be capable of effectively administering a food distribution program under section 2013(b) of this title or a supplemental nutrition assistance program under section 2020(d) of this title." *Id.*

29

In Delaware, that "State agency" is DHSS, not the DDOJ. Based on that fact, the State argues that whatever § 6(b)(2) may mean for DHSS, it does not stop the DDOJ from bringing a lawsuit.

For starters, we draw a different conclusion from the fact that § 6(b)(2) is directed only at "State agencies" rather than the State as a whole. Under the Food and Nutrition Act and its implementing regulations, it is the "State agency" rather than the "State" that has responsibility for administering the program,[91] including the collection of overissued benefits resulting from fraudulent claims.[92] That undermines, not strengthens, the notion that Congress intended for other state entities such as the DDOJ to have their own independent role in enforcing prohibitions on fraud in obtaining SNAP benefits. In other words, SNAP is a

---

[91] *See, e.g.*, *id.* § 2013(a) (authorizing the Secretary of the Department of Agriculture "to formulate and administer a supplemental nutrition assistance program under which, at the request of the State agency, eligible households within the State shall be provided an opportunity to obtain a more nutritious diet"); *id.* § 2020(a)(1) ("The State agency of each participating State shall have responsibility for certifying applicant households and issuing EBT cards."); *id.* § 2020(b) ("When a State agency learns . . . that it has improperly denied, terminated, or underissued benefits to an eligible household, the State agency shall promptly restore any improperly denied benefits to the extent required . . . ."); *id.* § 2020(c)(2) (requiring "[t]he administration of the program by a State agency" to be consistent with the Age Discrimination Act of 1975, § 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990, and Title VI of the Civil Rights Act of 1964); *id.* § 2015(d)(1)(C) (giving the "State agency" a role in determining the length of ineligibility to participate in SNAP for individuals who refuse employment); *id.* § 2016(e) (making the "State agency . . . strictly liable to the Secretary for any financial losses involved in the acceptance, storage and issuance of benefits," with certain exceptions); 7 C.F.R. § 271.4(a) ("The State agency shall be responsible for the administration of the program within the State . . . .").
[92] *See* 7 U.S.C. § 2022(b) (requiring the "State agency" to "collect any overissuance of benefits issued to a household"); 7 C.F.R. § 271.4(b) ("FNS delegates to the State agency, subject to the standards in § 273.18, the authority to determine the amount of, and settle, adjust, compromise or deny all or part of any claim which results from fraudulent or nonfraudulent overissuances to participating households.").

cooperative federalism program, and the entity of the State of Delaware that serves as the federal government's implementing partner is DHSS. It is DHSS, not the DDOJ, that Congress has given the authority to act under the Food and Nutrition Act. It would do violence to the Act to read it as addressing only the one state agency that actually has a proper role under the statute, with every other entity of the State—none of which has a legitimate role under the Act—being left free to proceed against a recipient who might have improperly obtained benefits in any way that the other entity sees fit.[93] That is especially the case where—unlike some other cooperative federalism programs such as Medicaid where the federal and state governments share the costs of providing benefits—the improperly obtained benefits are entirely federally funded.[94]

Most importantly, the State's argument, if accepted, would in reality nullify Congress's decision in the 1981 omnibus legislation to amend § 6(b)(2) to strike the "or both" language. If states could proceed in both ways simply by funneling the

---

[93] We also wonder how the State assumes that DHSS is free to share beneficiary files, which likely involve personal information, with state agencies that are not authorized to receive it and have no role under the Food and Nutrition Act. In this regard, it seems likely that the DDOJ is involved because it acted as counsel for DHSS in the administrative proceeding against Gonzalez. *See* Answering Br. at 16–17 ("[A] Deputy Attorney General litigated the [administrative hearing] on behalf of [DHSS].").

[94] Although federal and state governments share administrative expenses under SNAP, the cost of the actual benefits—which comprise the lion's share of the costs of the program—are entirely funded by the federal government. *See* Food and Nutrition Service, Supplemental Nutrition Assistance Program Participation and Costs (Feb. 22, 2019), https://fns-prod.azureedge.net/sites/default/files/pd/SNAPsummary.pdf.

court action through another agency and ensuring that there is no "referral" by the state agency responsible for administering the benefits, Congress's decision to change the statutory text would have little consequence. We must presume, however, that "[w]hen Congress acts to amend a statute, . . . it intends its amendment to have real and substantial effect."[95]

Finally, the State's odd argument is also belied by Delaware's own practices and procedures regarding SNAP. Even under the State's view—in which § 6(b)(2) applies only to the state agency responsible for day-to-day program administration—a state agency such as DHSS could not both proceed administratively and "refer[]" the matter "to appropriate authorities for civil or criminal action in a court of law."[96] But the State's regulations governing the collection of overpayments in connection with intentional program violations demonstrate that, as one would expect, DHSS is the entity that determines when there is a case of potential SNAP fraud, and upon discovery of such fraud, it may "refer[]" the matter to the DDOJ for a civil or criminal action in court.[97] The Delaware Social Services Manual sets forth specific criteria governing when "[o]verpayments should be referred to [the DDOJ] for

---

[95] *Stone v. INS*, 514 U.S. 386, 397 (1995).
[96] 7 U.S.C. § 2015(b)(2).
[97] *See* 16 Del. Admin. C. § 7001 (giving the Audit and Recovery Management Services arm of DHSS "the responsibility for . . . the preparation of Referral for Prosecution for felony indictment to the Office of the Attorney General; referral of a case directly to a court of competent jurisdiction; or, preparation of an administrative overpayment"); *id.* § 7003.1 (directing DHSS to "refer[]" overpayments to the DDOJ for prosecution when there is "evidence of intentional violation (e.g., information intentionally omitted from application form)").

32

prosecution," with "[s]uspected intentional violations meeting [these] criteria . . . to be transmitted using a 'Referral for Prosecution and Overpayment Form.'"[98] Such referral for prosecution is supposed to occur "in lieu of an administrative disqualification hearing."[99] In effect, the State's view of § 6(b)(2) would depend on there being a loophole in which a state could proceed both administratively and in court so long as the agency that administers the benefits program does not "refer" the case to the prosecuting agency,[100] but Delaware's own procedures and practices suggest that this condition of "no referral" will not be met. Indeed, the State does not claim that DHSS—the "State agency" under § 6(b)(2)—did not refer this matter.

\* \* \*

For these reasons, we hold that federal law prohibits the State from bringing a civil action against a SNAP recipient after already bringing a successful administrative action against the recipient based on the same intentional program violations.

---

[98] *Id.* § 7003.1. The regulations recommend referral when there is evidence of an intentional violation and either estimated net overpayment in excess of $1,000, interstate fraud, or a case involving a repeat offender with previous documented offenses of $500 or more. *Id.*

[99] *Id.* § 2023.3 ("If the condition in items 1 or 2 [defining intentional program violations] are met and the claim meets the criteria for referral to the Department of Justice as set forth in DSSM 7003, it will be referred for prosecution in lieu of an administrative disqualification hearing.").

[100] We have no doubt that Congress did not intend to create such an artificial distinction based solely on whether the prosecuting agency receives a "referral" or discovers the fraud in some other way.

**IV.**

When determining whether a federal statute preempts state law, the "ultimate touchstone" of our inquiry is "the purpose of Congress."[101]  In this case, the relevant statutory text, statutory history, and administrative interpretations of that statute show that Congress intended to require its state partners in SNAP to choose between proceeding against an individual accused of food benefits fraud either administratively or in court.  By doing both, the State did not comply with that federal mandate.  Because federal law prohibits the State's course of action and federal law is the supreme law of the land, we reverse the Superior Court's decision granting the State's motion for judgment on the pleadings.

---

[101] *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288, 1297 (2016) (internal quotation marks omitted).

34