# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, *ex rel.* KATHLEEN JENNINGS, Attorney General of the State of Delaware | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0030-JTL |
| | ) | |
| CITY OF SEAFORD, an incorporated municipality of the State of Delaware, | ) ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Date Submitted:  May 12, 2022
Date Decided: June 29, 2022

Christian Douglas Wright & Vanessa L. Kassab, STATE OF DELAWARE DEPARTMENT OF JUSTICE, *Attorneys for Plaintiff.*

Daniel A. Griffith, WHITEFORD TAYLOR & PRESTON LLC, *Attorney for Defendant.*

**LASTER, V.C.**

In December 2021, the City of Seaford enacted an ordinance titled "Ordinance Relative to Abortion." Its central provision mandates that all fetal remains resulting from an abortion or miscarriage be cremated or interred. The requirement applies no matter the gestational stage of the fetal remains. The State of Delaware filed suit, seeking injunctive relief prohibiting the enforcement of the ordinance and a declaratory judgment that the ordinance is invalid.

In a society divided over the issue of abortion, any decision that touches on that topic carries heightened significance, and particularly so after *Dobbs v. Jackson Women's Health Organization*, 597 U.S. — (2022). The *Dobbs* decision overruled *Roe v. Wade*, 410 U.S. 113 (1973), and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), which recognized that women have rights to bodily integrity, personal liberty, and self-determination under the United States Constitution, that respecting those rights is necessary to achieve the equality of women and men under the law, and that a woman's right to make decisions about bodily integrity, parenthood, and family therefore must be balanced against any interests that a government might seek to address when regulating abortion. Particularly after *Casey*, challenges to laws regulating abortion frequently turned on whether the challenged regulation imposed an undue burden on or a substantial obstacle to the ability of women to exercise their federal constitutional rights.

This case does not involve federal constitutional rights. Even before *Dobbs*, the Supreme Court of the United States had held that a state statute which imposed a cremate-or-inter requirement for fetal remains did not unduly burden the ability of women to exercise their federal constitutional rights. *See Box v. Planned Parenthood of Ind. & Ky.*,

*Inc.*, 139 S. Ct. 1780 (2019). Under that controlling precedent, a challenge to the ordinance on federal constitutional grounds could not succeed. The momentous ruling in *Dobbs* therefore did not affect the course of this case.

Instead of relying on federal constitutional law, the State maintains that the ordinance conflicts with state law, making it invalid under the settled principle that the law of a junior sovereign (the City) cannot conflict with the law of a senior sovereign (the State). The State's argument does not rely on any Delaware law concerning abortion.[1] Rather, the State relies on Delaware's overarching statutory scheme for the disposal of human remains.

Delaware's statutory scheme requires an official record of death before human remains can be cremated or interred. Delaware law only authorizes the issuance of an official record of death for fetal remains that both (i) result from a miscarriage and (ii)

---

[1] By statute, Delaware law authorizes a physician to terminate a human pregnancy before viability. 24 *Del. C.* § 1790(a). Delaware law generally prohibits a physician from terminating a human pregnancy after viability, but authorizes a physician to act if, in the good faith medical judgment of the physician, the termination is necessary for the protection of the woman's life or health or if, due to a fetal anomaly, there is not a reasonable likelihood of the fetus's sustained survival outside the uterus without extraordinary medical measures. *Id.* § 1790(b). The State does not argue that the ordinance interferes with the Delaware statute authorizing physicians to perform abortions. The State also does not contend that the ordinance interferes with rights protected under the Delaware Constitution, which can exceed those provided at the federal level. *See* Randy J. Holland, *State Constitutions: Purpose and Function*, 69 Temp. L. R. 989, 1003 (1996) ("Federal Constitutional standards, however, set only a minimum level of protection. The Declaration of Rights or substantive provisions in a state's constitution may, and often do, provide for broader or additional rights. The expansion beyond federally guaranteed individual liberties by a state constitution is attributable to a variety of reasons: differences in textual language, legislative history, pre-existing state law, structural differences, matters of particular concern, and state traditions." (footnotes omitted)).

either weigh more than 350 grams or otherwise indicate a gestational stage of twenty weeks or more. Other fetal remains cannot receive an official record of death. Consequently, under Delaware law, fetal remains resulting from an abortion cannot be cremated or interred. The same is true for fetal remains resulting from a miscarriage that do not satisfy the gestational threshold. Delaware law instead requires that fetal remains falling in these categories be incinerated.

The ordinance conflicts with this statutory scheme in that it requires that all fetal remains resulting from an abortion or miscarriage be cremated or interred. State law does not permit that result.

As the City concedes, a junior sovereign cannot enact a law that conflicts directly with a law established by the senior sovereign. In Delaware's governmental hierarchy, the State is the senior sovereign. The City is the junior sovereign. Because the ordinance conflicts with Delaware law, it is preempted. Summary judgment is granted in favor of the State and against the City.

## I.  FACTUAL BACKGROUND

The factual record for purposes of the cross-motions for summary judgment consists of thirty-nine stipulated facts and fifteen exhibits. Dkt. 23 ("Stipulation" or "Stip."). No one contends that there are any disputes of fact that would prevent the issuance of summary judgment. The motion is therefore deemed submitted for decision on the stipulated record. *See* Ct. Ch. R. 56(h).

## A. The City

The City is an incorporated municipality of Delaware with a population of approximately 7,957 persons. Stip. ¶ 1. The General Assembly has empowered municipal corporations like the City to exercise sovereign authority under Delaware's "Home Rule Provision." 22 *Del. C.* § 802. That statute provides that

> [e]very municipal corporation in [Delaware] containing a population of at least 1,000 persons . . . may proceed as set forth in this chapter to amend its municipal charter and may, subject to the conditions and limitations imposed by this chapter, amend its charter so as to have and assume all powers which, under the Constitution of this State, it would be competent for the General Assembly to grant by specific enumeration and which are not denied by statute.

*Id.* The City has claimed the authority granted under the Home Rule Provision. Its charter provides that the City "shall have, and may exercise, all powers which, under the Constitution of the State of Delaware, it would be competent for this Charter specifically to enumerate." Seaford, Del., C. (Charter) § 4(B).

The governing body of the City is the City Council, which consists of the Mayor and five councilmembers. The City Council holds regular meetings twice a month and special meetings when necessary.

## B. The September 28 Council Meeting

During a regular meeting of the City Council on September 28, 2021, the Mayor presented a draft ordinance for its first reading that addressed the disposal of fetal remains following an abortion. Stip. Ex. 2 at 4. The Mayor explained that the draft ordinance was "being proposed in an effort to change the procedure by which fetal remains are disposed of after [a] pregnancy is voluntarily terminated within the City of Seaford." *Id.* He noted

4

that "the remains of a terminated pregnancy are currently disposed of using medical waste protocols." *Id.* He explained that the draft ordinance would require that "any remains from a voluntary termination of pregnancy be disposed of via cremation or inter[]ment." *Id.* At the time, the Mayor observed that he did not believe that there were any medical facilities performing abortions in the City. *Id.* at 5.

The City Council discussed the draft ordinance. One of the councilmembers asked whether the City "had the authority to implement this ordinance without the approval of the State of Delaware." *Id.* at 4. The City Solicitor correctly observed that "the City is unable to enact any law that conflicts with current Delaware Law." *Id.* The City Solicitor expressed his view that "[a]s there is no specific Delaware law that requires the woman or facility to choose [cremation or interment] for disposal, the City of Seaford is not in conflict with Delaware law." *Id.*

## C.     The October 12 Meeting

On October 12, 2021, the City Council held a regular meeting at which it was scheduled to vote on the draft ordinance. Stip. ¶ 9. Approximately four and a half hours before the meeting, the City received a letter from the Chief Deputy Attorney General for the State of Delaware that questioned whether the City Council had the legal authority to enact the draft ordinance. *Id.* Ex. 4. The letter asked that the City Council "table this ordinance until such time as [the Delaware Department of Justice] [is] able to assess whether this ordinance is consistent with federal and state law." *Id.* That same day, the American Civil Liberties Union sent a letter questioning the legality of the draft ordinance. *Id.* Ex. 5 at 1.

5

During its meeting on October 12, 2021, the City Council discussed the letters. The City Council voted unanimously to table the draft ordinance until the Mayor and City Solicitor provided additional information to the Delaware Department of Justice.

On October 14, 2021, the City Solicitor sent an email to the Chief Deputy Attorney General outlining the City's position on the legal authority it possessed to enact the draft ordinance. Stip. ¶ 15. Over the ensuing weeks, the City Solicitor discussed the draft ordinance with other attorneys "to get some ideas of how the ordinance could be improved with some language that would explain why the City of Seaford has the authority to [enact the draft ordinance] and to address any concerns that the State may have to address proactively." *Id.* Ex. 8 at 2.

Based on these discussions, the draft ordinance was expanded to address fetal remains from miscarriages so that both types of fetal remains would be treated identically. *Id.* The revisions also removed a provision from the draft ordinance that purported to eliminate the requirement that "[a]n operator of a [crematorium] . . . secure a death certificate, burial permit, transportation permit, or a cremation authorization form" before cremating or interring fetal remains. *Compare id.* Ex. 1 at 11, *with id.* Ex. 6 at 133. A similar provision had appeared in an Indiana statute that the Supreme Court of the United States upheld against a federal constitutional challenge. *See Box*, 139 S. Ct. 1780.

## D.     The December 14 Meeting

On December 14, 2021, the City Council met to consider the revised version of the draft ordinance. *See* Stip. Ex. 6 at 2. Five hours before the meeting, the City received a letter from the Attorney General for the State of Delaware expressing the view that the City

6

Council lacked the legal authority to enact the draft ordinance. *Id.* Ex. 7 at 1; *see* Stip. ¶ 19. The Attorney General asserted, among other things, that the draft ordinance would be "entirely preempted by State law." Stip. Ex. 7 at 1; *see id.* at 2–4.

During the meeting, before discussing the substance of the draft ordinance, the Mayor referenced the Attorney General's letter. The Mayor noted that if litigation arose, then "someone ha[d] stepped up to financially support the city if the need arises at no cost to the taxpayers." *Id.* Ex. 8 at 1.

The City Solicitor described the changes to the draft ordinance. *Id.* at 2. He explained that "most of the language included in this ordinance was taken from prior laws that had been pas[sed] and upheld." *Id.* The City Solicitor highlighted that the draft ordinance had been revised to "ensure and emphasize the fact that a woman has a right to an abortion within the State of Delaware" and to identify "[t]he State of Delaware code provisions that allow the city to enact this type of ordinance." *Id.* The City Solicitor also pointed to language in the draft ordinance stating that "if the State legislates on this issue, then the city is not able to enact ordinances that are contrary to that legislation." *Id.* The City Solicitor expressed his view that there was no inconsistency between the draft ordinance and State law.

One councilmember disagreed and expressed the view that the draft ordinance, if enacted, "would not be legal or withstand legal challenge." *Id.* at 4. The councilmember argued that any legislation like the draft ordinance "should be done at the Legislative Hall level." *Id.* Another councilmember questioned whether there had been sufficient time for the City Solicitor to give meaningful consideration to the Attorney General's letter. *Id.* The

City Solicitor responded that "more time would not change his position" on the validity of the draft ordinance. *Id.*

After the discussion, the City Council voted to adopt the draft ordinance. Five members were present. Three voted in favor; two voted against. Stip. ¶ 21; *see id.* Ex. 8 at 6. Five months later, in May 2022, the City Council would vote to amend the ordinance. For clarity, this decision refers to the ordinance that was adopted in December 2021 as the "Original Ordinance" and the amended version adopted in May 2022 as the "Amended Ordinance." *Compare* Stip. Ex. 10 (Original Ordinance or "Original Ord."), *with* Dkt. 34 Ex. (Amended Ordinance or "Am. Ord.").

**E. The Terms Of The Original Ordinance**

The express purpose of the Original Ordinance was "to establish a process for the disposition of fetal remains within the City of Seaford." Original Ord. 8.9.1. Its core substantive provision stated: "Final disposition of Fetal Remains from a Miscarriage at a Health Care Facility or surgical Abortion at an Abortion Facility must be by either: (i) Cremation or (ii) Interment. Cremation must occur in a licensed Crematory facility." *Id.* § 8.9.4 (the "Cremate-or-Inter Provision").

The scope of the Cremate-or-Inter Provision turns on a series of important defined terms, starting with "Fetal Remains." The Original Ordinance defined that term broadly as "an aborted or miscarried fetus, fetal tissue or any other similar remains that results from the miscarriage or abortion of an Unborn Child." *Id.* § 8.9.3(F). The Ordinance defines "Unborn Child" as "an individual living member of the species, homo sapiens, throughout

8

the entire embryonic and fetal stages of the unborn child from fertilization to Full gestation and childbirth." *Id.* § 8.9.3(P).

Other important definitions include the following:

- "Abortion" means "the use of any instrument, medicine, drug, or any other similar device or substance used with intent to terminate the pregnancy of a woman known to be pregnant, with intent other than to increase the probability of a live birth, to preserve the life or health of the child after live birth, or to remove a dead fetus." *Id.* § 8.9.3(A).

- "Cremation" means "the heating process by which a human body or body parts are reduced to bone fragments through combustion and evaporation or other similar methods." *Id.* § 8.9.3(C).

- "Interment" means "the burial or entombment of fetal remains." *Id.* § 8.9.3(J).

- "Miscarriage" means "the spontaneous or accidental death of an unborn child before expulsion or extraction from the Unborn Child's mother." *Id.* § 8.9.3(M).

- "Pregnant" means "the human female reproductive condition, of having a living Unborn Child within her body throughout the entire embryonic and fetal stages of the unborn child from fertilization to full Gestation and childbirth." *Id.* § 8.9.3(N).

The Original Ordinance authorized the person obtaining an abortion or undergoing a miscarriage to choose whether the Fetal Remains would be cremated or interred. *Id.* § 8.9.5. The operative language stated:

> A pregnant woman who has a Miscarriage at a Health Care Facility or surgical Abortion in Seaford has the right to determine the following regarding the Fetal Remains: (i) whether the final disposition of the remains is by Cremation or Interment, and (ii) the location for the final disposition of the remains.

*Id.*

If the person obtaining the abortion or undergoing the miscarriage did not make a choice, then the Original Ordinance provided that the health care facility where the abortion

9

or miscarriage took place must decide whether the Fetal Remains will be cremated or interred. The operative language stated: "If a woman does not desire to exercise [that right], . . . then the Health Care Facility or Abortion Facility shall determine whether final disposition of Fetal Remains is by (i) Cremation or (ii) Interment, and the location of the Fetal Remains." *Id.* § 8.9.7.

The Original Ordinance also contained a provision which capped how long a patient who obtained an abortion or suffered a miscarriage could stay at a medical facility in the City. *Id.* § 8.9.13 (the "Limited Stay Provision"). The operative language stated:

> Regardless of the method selected for the disposition of remains by a woman, Ambulatory Surgical Treatment Centers shall not provide beds or other accommodations for the stay of a patient to exceed twelve (12) hours duration; provided, that the length of stay may be extended for an additional twelve (12) hours in the event such stay is deemed necessary by the attending physician, the facility medical director, or the anesthesiologist for observation or recovery, but in no event shall the length of stay exceed twenty-four (24) hours.

*Id.*

The Original Ordinance imposed a reporting requirement which directed the person in charge of the facility where an abortion took place to report the abortion to the Office of Vital Statistics of the State of Delaware within ten days after the procedure. *Id.* § 8.9.16(A) (the "Reporting Requirement"). The operative language stated: "Each Abortion that occurs in Seaford shall be reported to The Office of Vital Statistics within ten (10) days after the procedure by the person in charge of the institution in which the Abortion was performed." *Id.* Under Delaware law, the Office of Vital Statistics maintains official records of births and deaths, including fetal deaths resulting from a miscarriage where the fetal remains

10

either weigh more than 350 grams or indicate a gestational stage of twenty weeks or more. A different office, the Delaware Health Statistics Center, keeps records of induced terminations of pregnancies, and those records are used solely for statistical purposes; they are not official records of births or deaths. There does not appear to be any state office that tracks miscarriages in which the fetal remains do not weigh more than 350 grams or otherwise indicate a gestational stage of twenty weeks or more.

The Original Ordinance provided that "[v]iolation of this Ordinance shall be enforced either by way of civil infraction or by way of notice and order, with associated fines for such violation." *Id.* § 8.9.20. The Original Ordinance did not provide any guidance on what conduct would lead to punishment by civil infraction versus punishment "by way of notice and order." The Original Ordinance did not detail the "associated fines" for violations.

## F. The December 30 Council Meeting

On December 30, 2021, the City Council held a special meeting at which the members considered a proposal to stay enforcement of the Original Ordinance. Stip. Ex. 9 at 2. The City Solicitor explained that the proposal to stay enforcement was "not a reconsideration of the ordinance . . . [but] instead, it is a motion to stay enforcement of that ordinance indefinitely, pending action by the [G]eneral [A]ssembly." *Id.* Ex. 11 at 1.

All four of the members of the City Council who were present voted to stay enforcement. One of the councilmembers expressed his view that "the [S]tate of Delaware currently has a law in place that handles fetal remains." *Id.* at 2.

11

After the meeting, the Mayor expressed his view that the stay would remain in effect through June 2022. He noted that if the General Assembly had not enacted legislation by that time, then he thought the City Council "will get antsy and want to move forward." Stip. ¶ 30. He also stressed that "this stay can be lifted at any time that [the] council chooses." *Id.*

The day after the City Council voted, the Attorney General issued a statement that she intended to file litigation challenging the Original Ordinance. *Id.* ¶ 23.

## G.    This Litigation

On January 11, 2022, the Attorney General initiated this lawsuit by filing a complaint against the City. Dkt. 1. The complaint contained a single count, which asserted that the Original Ordinance was "preempted by State law." *Id.* ¶ 42. The State asked the court to issue a declaratory judgment stating that the Original Ordinance was "invalid, null, and void in its entirety." *Id.* at 21. The State also asked the court to issue a "preliminary and permanent injunction against the City . . . prohibiting the lifting of the City's temporary stay of enforcement" or, in the alternative, "prohibiting the effectiveness and enforcement" of the Original Ordinance. *Id.*

Concurrent with the filing of the complaint, the State moved for expedited proceedings. Dkt. 2. On January 17, 2022, the City filed an opposition to the motion to expedite and a motion to dismiss. Dkt. 9. The City noted that it had voluntarily stayed enforcement of the Original Ordinance until July 1, 2022. *Id.* ¶ 1. The City argued that the dispute "will be rendered moot" because of anticipated legislative action by the General

12

Assembly. *Id.* The City's motion to dismiss argued that the dispute was "not ripe for adjudication" because of the stay of enforcement. *Id.* ¶ 28; *see id.* ¶¶ 31–33.

On January 18, 2022, the court held a telephonic hearing on the motion for expedited proceedings. Dkt. 14. After hearing argument, the court granted the State's motion to expedite. *Id.* The court explained that "an actual and ripe dispute between the parties does exist" because "[t]he City has enacted an ordinance that it believes is lawful" and which the "State views . . . as unlawful and preempted." Dkt. 20 at 19. The court acknowledged that the City's voluntary stay of enforcement was "helpful" because it "avoids the need for the State to seek . . . preliminary relief." *Id.* at 19–20. But that undertaking did not mean that a dispute did not exist or that the issue was not ripe. *Id.* at 20. The court noted that the "possibility that the General Assembly may legislate on this area also is not enough to warrant not scheduling this matter" because the "possibility of that coming to pass is remote and contingent." *Id.*

The parties agreed to brief cross-motions for summary judgment. On May 12, 2022, the court held oral argument on the cross-motions. Dkt. 33.

## H.  The Amended Ordinance

During a meeting on May 10, 2022, two days before the hearing on the parties' cross-motions for summary judgment, the City Council voted to amend the Original

Ordinance. In its place, the City Council adopted the Amended Ordinance. Of the four councilmembers present, three voted in favor and one voted against.[2]

The Amended Ordinance did not alter the Cremate-or-Inter Provision or any of the associated definitions. Those provisions remain in place and at issue.

The Amended Ordinance modified the Limited Stay Provision to eliminate the temporal restriction on a patient's length of stay. The provision now states: "Regardless of the method selected for the disposition of remains by a woman, Ambulatory Surgical Treatment Centers shall provide beds or other accommodations for the stay of a patient until the patient has met the facility's criteria for discharge." Am. Ord. § 8.9.13.

The Amended Ordinance also modified the Reporting Provision. The provision now states: "Each Abortion that occurs in Seaford shall be reported to the Delaware Health Statistics Center within thirty (30) days after the end of the month in which the procedure was performed by the person in charge or a designated representative of the institution in which the Abortion was performed, consistent with 16 *Del. C.* § 3133." *Id.* § 8.9.16. The Amended Ordinance thus contemplates reporting to the state office that keeps statistical records regarding induced terminations of pregnancies, rather than the state office that maintains official records of births and deaths.

---

[2] *Minutes of the Meeting of the City of Seaford Mayor and Council*, City of Seaford (May 10, 2022), https://www.seafordde.com/common/pages/DisplayFile.aspx?itemId=18571278.

The Amended Ordinance also revised language in a section laying out "Requirements for Operators of Crematories." *Id.* § 8.9.15. The Original Ordinance provided a list of ways an operator could dispose of cremated Fetal Remains. *See* Original Ord. § 8.9.15. The Amended Ordinance removed that list and instead instructed that the operator could not dispose of "Cremated Fetal Remains by a means other than returning the Cremated Fetal Remains to the responsible party in a secure container or vessel of no less construction than that of a minimum metal material, ridge plastic material or heavy grade corrugated material, consistent with [24 Del. Admin. C. § 3100-13.2.8]." Am. Ord. § 8.9.15; *see* Stip. Ex. 15 (redline comparing the Original Ordinance with the Amended Ordinance).

## II. THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). "When opposing parties make cross motions for summary judgment, a judge should not grant . . . summary judgment for one party unless no genuine issue of material fact exists and that party is entitled to a judgment as a matter of law." *Wygant v. Geico Cent.*, 27 A.3d 553, 2011 WL 3586488, at *1 (Del. 2011) (TABLE).

> Where the parties have filed cross motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions.

Ct. Ch. R. 56(h).

15

The parties have filed cross-motions for summary judgment. Neither side argues that there are any issues of material fact in dispute. Instead, the parties helpfully stipulated to a set of operative facts that incorporated documents by reference.

What remains is solely a question of statutory interpretation. Summary judgment is well-suited to resolve such matters. *See Techmer Accel Hldgs., LLC v. Amer*, 2010 WL 5564043, at *4 (Del. Ch. Dec. 29, 2010) ("[B]ecause the core dispute [as to one of the counts] turns on the proper interpretation of a statutory provision, a trial would not produce a more informed analysis of that claim."); *Korn v. New Castle Cnty.*, 2005 WL 396341, at *4 n.28 (Del. Ch. Feb. 10, 2005) ("The Court is positioned to grant summary judgment as to [three of the counts], because the [stipulation of facts] creates a record sufficient to determine that no genuine issue exists as to any material fact and, to a large extent, the relevant questions presented by those [c]ounts concern statutory interpretation.").

## III.   LEGAL ANALYSIS

The outcome of this case turns on the doctrine of preemption. That doctrine determines when "the law of a superior sovereign takes precedence over the laws of a lesser sovereign; for example, a federal law preempting a state law or a state law preempting a city or county ordinance." *A.W. Fin. Servs., S.A. v. Empire Res., Inc.*, 981 A.2d 1114, 1121 (Del. 2009).

16

The situations where preemption applies resist easy categorization.[3] One situation, however, is straightforward: If a state law and a municipal ordinance directly conflict, then the state law prevails.[4] A conflict exists "[i]f the ordinance expressly permits what a statute expressly forbids, or vice versa." *4th Generation Ltd. v. Bd. of Adjustment of City of Rehoboth Beach*, 1987 WL 14867, at *9 (Del. Super. July 16, 1987).[5]

---

[3] *See, e.g.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000) ("We recognize, of course, that the categories of preemption are not 'rigidly distinct.'" (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990))); *English*, 496 U.S. at 79 n.5 (describing preemption categories as not "rigidly distinct," observing that "field preemption may be understood as a species of conflict pre-emption," and explaining that "[a] state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation").

[4] *Taylor v. Smith*, 115 A. 413, 414 (Del. Ch. 1921) (explaining that the "legislative power of [a] municipality . . ., expressing itself through [its] council, is inferior and subordinate to the legislative power of the state, whose creature it is"); *State v. Putman*, 552 A.2d 1247, 1249 (Del. Super. 1988) ("[W]here a conflict exists between a state statute and a municipal ordinance, the statute must always prevail.").

[5] A conflict also can exist if "the local ordinance . . . hinder[s] the objectives of the state statute." *Cantinca v. Fontana*, 884 A.2d 468, 473–74 (Del. 2005). This branch of conflict preemption applies when "the ordinance cannot exist harmoniously with a state statute because the ordinance is diametrically in opposition to it." 56 Am. Jur. 2d Municipal Corporations, Etc. § 306, Westlaw (database updated May 2022). Sometimes known as "obstacle preemption," the doctrine applies when the law of a junior sovereign "stands as an obstacle to the accomplishment and execution of the full purposes and objective of" the senior sovereign. *Gonzalez v. State*, 207 A.3d 147, 154 (Del. 2019) (cleaned up). The conflict in this case is direct, so this decision need not consider other dimensions of conflict preemption. This decision also need not consider the doctrine of field preemption. *See, e.g.*, *id.* (noting that the legislative body can impliedly preempt the field if "it is clear, despite the absence of explicit preemptive language, that Congress has intended, by legislating comprehensively, to occupy an entire field of regulation and has thereby left no room for [the junior sovereign] to supplement [the senior sovereign's] law" (cleaned up)); *Cantinca*, 884 A.2d at 473 (noting that the legislative body can expressly preempt the field if "the statutory text or legislative history explicitly provides or demonstrates that the state statute

The Amended Ordinance is preempted because the Cremate-or-Inter Provision conflicts directly with state law. The Cremate-or-Inter Provision requires that all fetal remains be cremated or interred. State law only permits that result for fetal remains that (i) result from a miscarriage and (ii) either weigh more than 350 grams or otherwise indicate a gestational stage of twenty weeks or more. The Amended Ordinance does not allow any fetal remains to be incinerated. State law requires that fetal remains be incinerated unless they qualify for cremation or interment. The Amended Ordinance thus commands what state law forbids and forbids what state law commands. As between state law and the Amended Ordinance, state law controls.

## A. Principles Of Statutory Interpretation

To determine whether a conflict exists between state law and a municipal ordinance, the court compares the language and effect of the two provisions. That task requires that a court proceed "much as [it] would any other [argument] about statutory meaning, looking to the text and context of the law in question and guided by the traditional tools of statutory interpretation." *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019).

"The Court's goal, in construing statutes and regulations, is to ascertain and give effect to the intent of the legislative body." *Garrison v. Red Clay Consol. Sch. Dist.*, 3 A.3d 264, 267 (Del. 2010). As a starting point, a court applying Delaware law "must seek to ascertain and give effect to the intention of the Legislature as expressed in the Statute

is intended to replace or prevail over any pre-existing laws or ordinances that govern the same subject matter").

18

itself." *Keys v. State*, 337 A.2d 18, 22 (Del. 1975). "[T]he words of the statute themselves are the first and most authoritative source of the meaning of its command." *Stoltz v. Wilm. Tr. Co.*, 1992 WL 127516, at \*5 (Del. Ch. June 9, 1992) (Allen, C.).

The Delaware Code states that "[w]ords and phrases shall be read with their context and shall be construed according to the common and approved usage of the English language." 1 *Del. C.* § 303. Consistent with this provision, the Delaware Supreme Court has instructed courts to "give the statutory words their commonly understood meanings." *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 230 (Del. 1982).

"If the statute as a whole is unambiguous and there is no reasonable doubt as to the meaning of the words used, the court's role is limited to an application of the literal meaning of those words." *In re Adoption of Swanson*, 623 A.2d 1095, 1096–97 (Del. 1993). That is, "where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion." *Friends of H. Fletcher Brown Mansion v. City of Wilm.*, 34 A.3d 1055, 1059 (Del. 2011) (cleaned up) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)); *see Swanson*, 623 A.2d at 1097 ("When statutory language is clear, unambiguous, and consistent with other provisions of the same legislation, the court must give effect to its intent.").

Only when the words of a statute "do not convey with clarity a single meaning when applied to a particular case . . . [is] a court . . . bound to interpret them." *Stoltz*, 1992 WL 127516, at \*5. Put another way, the court may only interpret a statute if it is ambiguous. A statute is "ambiguous if it is susceptible of two reasonable interpretations." *Taylor v.*

19

*Diamond State Port Corp.*, 14 A.3d 536, 538 (Del. 2011). The court will "consider the statute as a whole, rather than in parts, and [it] read[s] each section in light of all [the] others to produce a harmonious whole." *Id.* "Courts also should ascribe a purpose to the General Assembly's use of statutory language, and avoid construing it as surplusage, if reasonably possible." *In re Krafft-Murphy Co., Inc.*, 82 A.3d 696, 702 (Del. 2013) (cleaned up).

In this case, none of the pertinent provisions are ambiguous. Their plain meaning controls.

**B.      The Conflict Between The Amended Ordinance And Delaware Law**

As discussed in the Factual Background, the Cremate-or-Inter Provision in the Amended Ordinance requires cremation or interment for fetal remains. It does not distinguish between fetal remains that result from an abortion or a miscarriage. It also does not distinguish between fetal remains resulting from a miscarriage based on weight or indication of gestational stage. The Cremate-or-Inter Provision does not permit any fetal remains to be incinerated.

As described below, Delaware law establishes an overarching statutory scheme for the disposal of human remains. That scheme requires an official record of death before human remains can be cremated or interred. That scheme only permits the issuance of an official record of death for fetal remains that (i) result from a miscarriage and (ii) either weigh more than 350 grams or otherwise indicate a gestational stage of twenty weeks or more. Other fetal remains cannot receive an official record of death and therefore cannot be cremated or interred. Delaware requires that other fetal remains be incinerated.

20

### 1. The Provisions Governing Official Records

By statute, the Delaware Department of Health and Social Services ("DHSS") "has charge of the registration of births, deaths, . . . and fetal deaths and shall prepare the necessary methods, forms and blanks for obtaining and preserving such records and insuring the faithful registration of the same throughout this State and in the central Office of Vital Statistics." 16 *Del. C.* § 3102(a). The same statute charges DHSS with "the uniform and thorough enforcement of this chapter throughout the State and shall from time to time promulgate any additional forms and regulations that are necessary for this purpose." *Id.* § 3102(b).

### a. Definitions

To navigate the provisions governing the preparation of official records of death requires understanding a series of definitions. Those definitions distinguish between an "Induced Termination of Pregnancy," a "Spontaneous Fetal Death," and a "Stillbirth."

- "Induced Termination of Pregnancy" means "the purposeful interruption of an intrauterine pregnancy with the intention other than to produce a live-born infant or to remove a dead fetus and which does not result in a live birth." *Id.* § 3101(4).

- "Spontaneous Fetal Death" means "a spontaneous death (i.e., not an induced termination of pregnancy) prior to the complete expulsion or extraction from its mother of a product of conception. The death is indicated by the fact that after such separation, the fetus does not breathe or show any other evidence of life such as beating of the heart, pulsation of the umbilical cord or definite movement of voluntary muscles." *Id.* § 3101(9).

- "Stillbirth" means "any complete expulsion or extraction from its mother of a product of human conception that weighs 350 grams or more, or in the absence of weight, of 20 completed weeks gestation or more, resulting in other than a live birth and which is not an induced termination of pregnancy." *Id.* § 3101(10).

21

Notably, the definitions of Stillbirth and Spontaneous Fetal Death expressly exclude an Induced Termination of Pregnancy.

The statute uses the term "Stillborn Fetus" to refer to the fetal remains that result from a Spontaneous Fetal Death. The statute does not have a term for the fetal remains that result from an Induced Termination of Pregnancy. This decision uses the term "Aborted Remains."

Based on these definitions, only a subset of the fetal remains that can result from a Spontaneous Fetal Death meet the statutory definition of a Stillborn Fetus. To satisfy the statutory definition, the fetal remains must either weigh at least 350 grams or indicate a gestational stage of twenty weeks or more (the "Gestational Threshold").

The statute does not have a term for the fetal remains that result from a Spontaneous Fetal Death but which do not meet the Gestational Threshold and therefore do not qualify as a Stillborn Fetus. This decision uses the term "Pre-Threshold Remains."

The statute contains the following additional definitions:

- "Dead Body" means "a lifeless human body or such parts of such human body from the condition of which it reasonably may be concluded that death recently occurred." *Id.* § 3101(1).

- "Live Birth" means "the complete expulsion or extraction from its mother of a product of human conception, irrespective of the duration of pregnancy, which after expulsion or extraction breathes or shows any other evidence of life such as beating of the heart, pulsations of the umbilical cord or definite movement of voluntary muscles, whether or not the umbilical cord has been cut or the placenta is attached." *Id.* § 3101(6).

The statute thus distinguishes between a Live Birth, on the one hand, and a Stillbirth, Spontaneous Fetal Death, or Induced Termination of Pregnancy on the other hand.

22

### b. The Official Record Requirements

Using the multi-part classification system established by the definitions, Delaware law provides for different official records, one following a death, one following a Spontaneous Fetal Death, and one following an Induced Termination of Pregnancy.

The first official record is a "Certificate of Death." The operative statute states:

> A certificate of death for each death which occurs in this State shall be filed with the Office of Vital Statistics, or as otherwise directed by the State Registrar, within 3 days after death . . . , and prior to final disposition of the dead body, and shall be registered if it has been completed and filed in accordance with this section.

*Id.* § 3123(a). The Certificate of Death thus follows a "death" and must be issued "prior to final disposition of the dead body." A Live Birth followed by the death of the infant would result in the issuance of a Certificate of Death.

The second official record is a "Report of Fetal Death." The operative statute states:

> Each spontaneous fetal death of 350 grams or more, or in the absence of weight, of 20 completed week's gestation or more . . . which occurs in this State shall be reported within 3 days after delivery to the Office of Vital Statistics by filing a report of fetal death.

*Id.* § 3124. A Stillbirth thus results in a Report of Fetal Death.

The statute provides that "[t]he report of fetal death is the official record of birth and death for the fetal death." *Id.* When circumstances call for the issuance of a Report of Fetal Death, that is the official record. A Stillbirth therefore does not result in a Certificate of Death.

Aborted Remains and Pre-Threshold Remains do not generate a Report of Fetal Death. Only a Spontaneous Fetal Death that meets the Gestational Threshold will support

a Report of Fetal Death. Aborted Remains do not result in a Report of Fetal Death, because an Induced Termination of Pregnancy is not a Spontaneous Fetal Death. Pre-Threshold Remains do not result in a Report of Fetal Death, because Pre-Threshold Remains do not meet the Gestational Threshold.

The third official record is a "Report of Induced Termination of Pregnancy." The operative statute states:

> Each induced termination of pregnancy which occurs in this State, regardless of the length of gestation, shall be reported to the Delaware Health Statistics Center within the Division of Public Health by the person in charge or a designated representative of the institution or abortion facility in which the induced termination of pregnancy was performed. If the induced termination of pregnancy was performed outside an institution or abortion facility, the attending physician shall prepare and file the report. Such reporting shall occur within 30 days after the end of the month in which the induced termination of pregnancy was performed. These reports are to be used only for purposes of statistical analysis and shall not be incorporated into the permanent official records of the system of vital statistics. The reporting form shall include only those items recommended by the federal agency responsible for national vital statistics except that it shall not include any item that allows identification of patients or physicians. Furthermore, no statistical analysis shall be released which identifies the reporting institution or abortion facility.

*Id.* § 3133. This provision applies following an Induced Termination of Pregnancy. It is the only provision that applies following an Induced Termination of Pregnancy.

As noted, the definition of Spontaneous Fetal Death excludes an Induced Termination of Pregnancy. Section 3124 emphasizes the distinction by providing that "[i]nduced terminations of pregnancy shall not be reported as spontaneous fetal deaths." *Id.* § 3124. The statute thus makes clear at multiple points that Aborted Remains cannot result in a Report of Fetal Death. Even if the Aborted Remains satisfy the Gestational

Threshold, an Induced Termination of Pregnancy cannot be reported as a Spontaneous Fetal Death and cannot give rise to a Report of Fetal Death.

## 2. The Provisions Governing Burial Or Cremation

State law prescribes requirements for the disposal of dead bodies. State law provides that "[w]hen a death or fetal death occurs or a dead body is found, the body shall not be disposed of until the burial/transit permit is completed." 16 *Del. C.* § 3151 (the "Burial Permit Requirement"). The Office of Vital Statistics will issue a burial-transit permit only if it is presented with an official record of death. 16 Del. Admin. C. § 4204-8.0 ("A burial-transit permit will be issued by the Office of Vital Statistics upon the compliance of the funeral director with provisions of Section 7 and the presentation of a death certificate.").

State law specifically addresses the requirements for cremation. Under state law, "[n]o person shall destroy or dispose of by burning in this State the body of an individual dead from any cause, except in a crematorium or crematory licensed for this express purpose and under the conditions provided in §§ 3158–3164 of this title." 16 *Del. C.* § 3157. The statute requires a permit for cremation:

> A body may be cremated only after the preparation of a special cremation permit signed by the chief medical examiner or an assistant or deputy medical examiner. In the presentation of the cremation permit to the chief medical examiner or the chief medical examiner's representative for signature, the permit must be accompanied by a death certificate signed by the attending physician and by a cremation authorization signed by the next-of-kin or legal representative of the deceased.

*Id.* § 3159(a) (the "Cremation Permit Requirement"); *see id.* § 3159(b) (requiring the preparation of two copies of the cremation permit and that one of those copies "shall

accompany the death certificate when it is filed in the Office of Vital Statistics"). To obtain a cremation permit, there first must be an official record of death.

Under these provisions, neither a burial permit nor a cremation permit is available unless there is both a dead body and an official record of death. *See id.* §§ 3151, 3159; 16 Del. Admin. C. § 4204-8.0. Delaware law recognizes that a Stillborn Fetus is a dead body and that a Report of Fetal Death is an official record of death. By statute, the Report of Fetal Death must be filed with the Office of Vital Statistics "within 3 days after delivery or as soon as possible thereafter but prior to final disposition of the dead body." 16 *Del. C.* § 3124(1)–(2). Under the plain language of this provision, a Stillborn Fetus qualifies as a dead body for purposes of Delaware's statutory regime. *Accord id.* § 3151 ("When a death or fetal death occurs or a dead body is found, the body shall not be disposed of until the burial/transit permit is completed."). By law, the Report of Fetal Death is an official record of birth and death. *See id.* § 3124. A burial permit or cremation permit therefore can issue for a Stillborn Fetus.

A Spontaneous Fetal Death that does not result in a Stillborn Fetus cannot support the issuance of a Report of Fetal Death. However one might view Pre-Threshold Remains for ethical, moral, or religious purposes, they do not constitute a dead body under Delaware's statutory regime. Pre-Threshold Remains therefore do not generate an official record of death that can support a burial permit or cremation permit. Pre-Threshold Remains therefore cannot be buried or cremated.

Likewise, an Induced Termination of Pregnancy that results in Aborted Remains cannot support an official record of death, only a Report of Induced Termination of

26

Pregnancy. By statute, Reports of Induced Terminations of Pregnancy "are to be used only for purposes of statistical analysis and shall not be incorporated into the permanent official records of the system of vital statistics." *Id.* § 3133. However one might view Aborted Remains for ethical, moral, or religious purposes, they do not constitute a dead body under Delaware's statutory regime. Aborted Remains therefore cannot be buried or cremated.

### 3. The Provisions Requiring Incineration

An overlapping statutory regime requires the incineration of human remains that do not qualify for burial or cremation. The General Assembly has empowered the Delaware Department of Natural Resources and Environmental Control ("DNREC") to promulgate regulations concerning solid waste management. 7 *Del. C.* Ch. 60. DNREC has issued regulations consistent with that grant of authority (the "Solid Waste Regulations"). 7 Del. Admin. C. § 1301-2.0.

The Solid Waste Regulations prescribe different methods for handling and disposing of different types of waste. One type of waste is "Pathological Waste." The Solid Waste Regulations define Pathological Waste as "all human tissues and anatomical remains, including human fetal remains, which emanate from surgery, obstetrical procedures, autopsy, and laboratory procedures." *Id.* § 1301-11.3.

The Solid Waste Regulations dictate that "[a]ll pathological waste must be incinerated, cremated or interred in accordance with 24 *Del. C.* Ch. 31. Other disposal methods are not acceptable for this type of waste." *Id.* § 1301-11.11.2; *see id.* § 1301-11.7.4 ("Waste consisting of human anatomical remains, including human fetal remains, may not be disposed of at sanitary landfills. The remains must be incinerated, cremated or interred

27

in accordance with 24 *Del. C.* Ch. 31.”). The reference to Title 24 of Chapter 31 of the Delaware Code is a cross-reference to the statutes regulating funeral services. The incineration, cremation, or interment of Pathological Waste thus must comply with the laws governing funerals.

Delaware law defines a “Funeral Director” as a “person engaged in the care of human remains or in the disinfecting and preparing by embalming of human remains for the funeral service, transportation, burial, entombment or cremation, and who shall file all death certificates or permits as required by Chapter 31 of Title 16.” 24 *Del. C.* § 3101(7). Only a licensed Funeral Director can “engage in the practice of funeral services.” *Id.* § 3106(a). By statute, the term “Funeral Services” means “those services rendered for the disinfecting, embalming, burial, entombment or cremation of human remains . . . .” *Id.* § 3101(9).

To remain in good standing, a licensed Funeral Director cannot “illegally, incompetently, or negligently practice[] funeral services.” *Id.* § 3112(a)(2). The statutes that establish the Burial Permit Requirement and the Cremation Permit Requirements are plainly aspects of Delaware law. *See* 16 *Del. C.* §§ 3151, 3159. Accordingly, to remain in good standing, a licensed Funeral Director must comply with the Burial Permit Requirement and the Cremation Permit Requirement. A licensed Funeral Director cannot legally perform a burial or a cremation without complying with the Burial Permit Requirement and the Cremation Permit Requirement.

Because only a licensed Funeral Director can engage in funeral services, no one can perform a burial or cremation without complying with the Burial Permit Requirement and

28

the Cremation Permit Requirement. Both permits require an official record of death. Aborted Remains and Pre-Threshold Remains cannot receive an official record of death. The only option for disposing of Aborted Remains and Pre-Threshold Remains is through incineration.

4. **The Direct Conflict Between The Amended Ordinance And The State Scheme**

In sum, state law prohibits the burial or cremation of Aborted Remains. State law also prohibits the burial or cremation of Pre-Threshold Remains. State law requires the incineration of Aborted Remains and Pre-Threshold Remains. The Amended Ordinance directly conflicts with the state scheme in four ways.

First, the Cremate-or-Inter Provision requires that all fetal remains be cremated or interred. It therefore mandates the burial or cremation of Aborted Remains. That requirement is contrary to state law, which precludes the burial or cremation of Aborted Remains.

Second, by requiring that all fetal remains be cremated or interred, the Cremate-or-Inter Provision forbids the incineration of Aborted Remains. That requirement is contrary to state law, which requires the incineration of Aborted Remains.

Third, by requiring that all fetal remains be cremated or interred, the Cremate-or-Inter Provision mandates the burial or cremation of Pre-Threshold Remains. That requirement is contrary to state law, which precludes burial or cremation of Pre-Threshold Remains.

29

Fourth, by requiring that all fetal remains be cremated or interred, the Cremate-or-Inter Provision forbids the incineration of Pre-Threshold Remains. That requirement is contrary to state law, which mandates the incineration of Pre-Threshold Remains.

Sometimes, determining whether a conflict exists will present a "difficult question." *4th Generation*, 1987 WL 14867, at *8. This is not one of those times.

The history of the drafting of the Amended Ordinance suggests that the City identified these conflicts. The initial draft that was provided to City Council contained a provision providing that "[a]n operator of a Crematory facility is not required to secure a death certificate, burial permit, transportation permit, or a cremation authorization form to Cremate Fetal Remains." Stip. Ex. 1 at 11, § 8.9.14. That provision appeared in the Indiana statute, upheld by the Supreme Court of the United States in *Box*, which the City Solicitor used as a model for the ordinance. The Indiana legislature had authority to amend state law to remove those requirements. The City did not and does not have comparable authority to modify Delaware law. The revised draft that became the Original Ordinance dropped that exemption, which only serves to highlight the conflict with state law. *See* Dkt. 35 at 79 (counsel explaining that the City was "borrowing language that had already passed Constitutional muster," but "afterwards saw, well, a municipality can't do that the way a state can").

### 5. The City's Responses

The City offers three arguments in response. None change the result.

First, the City argues that the chapter of the Delaware Code governing funerals "does not limit burial and cremation to dead bodies," but rather extends to all "human

30

remains." Dkt. 32 at 17 (emphasis omitted). The City focuses on two definitions: (i) the definition of "Burial" as the "interment of human remains," and (ii) the definition of "Cremation" as the "process of burning human remains to ashes." 24 *Del. C.* § 3101(2)–(3). The City reasons that any human remains, including Aborted Remains and Pre-Threshold Remains, can be buried or cremated. But that argument fails to account for the statutory scheme as a whole.

The City makes a similar argument under the Solid Waste Regulations. The City points out that the Solid Waste Regulations define Pathological Waste to include "all human tissues and anatomical remains, including human fetal remains." *See* 7 Del. Admin. C. § 1301-11.3. The City reasons that because burial and cremation involve "human *remains*," and because Pathological Waste includes "*human* fetal *remains*," then human fetal remains can be cremated, buried, or interred in conformity with Delaware law.

That logic works for those isolated sections, but it ignores the other requirements for burial or cremation, including the Burial Permit Requirement and the Cremation Permit Requirement. A burial or cremation cannot proceed without the necessary permits, and those permits require both (i) human remains that qualify as a dead body under Delaware's statutory scheme and (ii) an official record of death. As explained previously, neither Aborted Remains nor Pre-Threshold Remains can qualify as a dead body for purposes of Delaware's statutory regime, and neither can support the issuance of an official record of death.

Second, the City argues that the State's statutory scheme does not expressly provide that Aborted Remains and Pre-Threshold Remains cannot be cremated or buried. Dkt. 29

31

at 23. It is true that no statute says that in so many words. But the statutory scheme as a whole rules it out. Aborted Remains and Pre-Threshold Remains cannot qualify as a dead body for purposes of Delaware's statutory regime, nor can they support the issuance of an official record of death, so they cannot be buried or cremated.

The City also stresses that standing alone, the Solid Waste Regulations identify incineration, burial, and cremation as valid options for the disposal of fetal remains. Unfortunately for the City, the Solid Waste Regulations do not stand alone. They expressly reference the statutory provisions on funeral services, which incorporate the Burial Permit Requirement and the Cremation Permit Requirement. Those requirements mandate that before a burial or cremation can take place, there must be both (i) human remains that qualify as a dead body under Delaware's statutory scheme and (ii) an official record of death. With both, burial or cremation is an option. Otherwise, the only option is incineration.

Third, the City contends that the Cremate-or-Inter Provision "does not necessarily prohibit incineration" because "incineration is the equivalent of cremation." Dkt. 32 at 18. The City characterizes incineration as "the process of destroying *any* waste via flame combustion" and argues that cremation is the "same process applied specifically to human remains." *Id.*

Neither the General Assembly nor the Solid Waste Regulations define incineration, but it is evident that incineration is not the same thing as cremation. The Solid Waste Regulations require Pathological Waste to be "incinerated, cremated *or* interred." 7 Del. Admin. C. § 1301-11.11.2 (emphasis added). Under standard principles of interpretation,

32

"words in a regulation should not be construed as surplusage if there is a reasonable construction which will give them meaning, and courts must ascribe a purpose to the use of regulatory language, if reasonably possible." *Garrison*, 3 A.3d at 267 (cleaned up); *see Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."). Thus, if "reasonably possible," the court will ascribe separate meanings to each term. *See Garrison*, 3 A.3d at 267.

In this case, it is easy to ascribe separate meanings to incineration and cremation. The General Assembly has defined an "'[i]ncerator,' 'incinerator structure or facility,' and 'waste incinerator'" to include "any structure or facility operated for the combustion (oxidation) of solid waste, even if the by-products of the operation include useful products such as steam and electricity." 7 *Del. C.* § 6002(25). The statutory definition excludes crematoriums. *Id.* § 6002(25)(a) ("'Incinerator' shall not include . . . Crematoriums . . . ."). The statutory language compels the conclusion that the General Assembly did not equate incinerators with crematoriums, nor incineration with cremation.

Regulations regarding the handling of human remains provide further insight into the distinction. Crematoriums may cremate only "one deceased human remains" at a time, and the "[c]omingling of cremated remains shall only occur with formal written authorization by the legal next of kin." 24 Del. Admin. C. § 3100-13.2.6–.7. The regulations provide detailed rules for the packaging of cremated remains:

> Following cremation, the cremated human remains must be returned to the responsible party in a secure container or vessel . . . . [and] [a]ny container, if used, or any type of cremation urn shall be clearly affixed with a label

33

clearly identifying the contents, which shall include the name of the decedent, date of passing, date of cremation, name of funeral home and name, address and phone number of the crematory of record.

*Id.* § 3100-13.2.8.

Incineration is different. There is no requirement that the remains be kept separate and individually incinerated. Instead, the Solid Waste Regulations require that "[a]ll infectious waste," which includes the category encompassing human remains, be double-bagged in two red bags, one inside the other. 7 Del. Admin. C. § 1301-11.8.2.1.1. The bags must be "labeled immediately after packaging," and the label must include, among other things, the "name, address and business telephone number of the generator . . . [and] 'Pathological Waste,' if pathological waste is included in the contents." *Id.* § 1301-11.8.3.1, .3. The remains are not individually incinerated. There is no requirement to separate the incinerated remains from the other incinerated material and place them in a container with identifying information. Such an effort seems impossible. Cremation and incineration are plainly distinct.

## C.     The Remedy

The Cremate-or-Inter Provision is preempted and invalid. The City concedes that the remaining provisions of the Amended Ordinance are inseverable from the Cremate-or-Inter Provision. Dkt. 32 at 23 n.42. Accordingly, the Amended Ordinance is preempted and invalid in its entirety.

The State seeks a permanent injunction against the enforcement of the Amended Ordinance. Dkt. 30 at 26; *see also* Dkt. 27 at 48. The City cannot enforce an invalid ordinance. An injunction is therefore unnecessary.

34

The State seeks an award of reasonable costs under Court of Chancery Rule 54(d). That rule provides that "[e]xcept when express provision therefor is made either in a statute or in these Rules, costs shall be allowed as of course to the prevailing party unless the Court otherwise directs." Ct. Ch. R. 54(d). The State prevailed and is therefore entitled as a matter of course to an award of costs.

The City counters that the State should not receive an award of costs because "[t]he City did everything it could to avoid this litigation" and the "State should not be awarded costs for litigation it easily could have avoided but actively sought." Dkt. 32 at 23 n.42. The City adopted an ordinance that conflicted with state law. The State put the City on notice that it intended to challenge the ordinance. The City adopted the Original Ordinance anyway. The only step the City took to avoid litigation was to stay enforcement of the Original Ordinance. That step was helpful in that it obviated the need for the court to determine whether some form of preliminary relief was warranted, but it did not do anything to avoid the litigation. If the City believed that the General Assembly would enact legislation addressing its concerns, the City should have awaited the General Assembly's action. Instead, the City went ahead, which caused the State to sue to enforce its statutory scheme.

The State is entitled to an award of costs as the prevailing party. The parties shall strive to reach agreement on the bill of costs. If the parties cannot agree, then the State may file an appropriate motion. A dispute over costs does not delay the entry of a final judgment. *See Emerald P'rs v. Berlin*, 811 A.2d 788, 791 (Del. 2001) ("[J]udgments on the merits become final without waiting for a ruling on the issue of costs alone. Accordingly, . . . the

pendency of a motion for costs alone does not delay the finality of a judgment on the merits."); *see also Immanuel Shelter, Inc. v. Bartholomew*, 191 A.3d 1109, 2018 WL 3569369, at *1 (Del. 2018) (TABLE) ("It is well-settled that a pending motion for costs does not toll the finality of a judgment.").

## IV. CONCLUSION

The Amended Ordinance is preempted and invalid. A final judgment will be entered to that effect.

Within ten days, the parties shall submit a proposed final judgment that has been agreed-upon as to form. If there are issues that the court must decide before final judgment can be entered, then the parties will submit a joint letter identifying the issues and proposing a schedule for their resolution.